Argued and submitted July 25, 2005, on appeal, reversed and remanded with instructions to enter modified judgment in favor of Cascade for past expenses in amount of $3,796,682, to declare ERC liable for future expenses beyond those that other insurers have paid until its policy limits are exhausted, to reconsider award of attorney fees, and to award prejudgment interest from July 3, 1997; otherwise affirmed; affirmed on cross-appeal May 17, petition for review allowed October 31, 2006 (341 Or 579)

CASCADE CORPORATION,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*v.*

AMERICAN HOME ASSURANCE CO.,
a New York corporation;
American Star Insurance Co.,
a Wisconsin corporation;
Fireman's Fund Insurance Co.,
a California corporation;
Granite State Insurance Co.,
a New Hampshire corporation;
Insurance Company of the State of Pennsylvania,
a Pennsylvania corporation;
Millers Mutual Fire Insurance Co. of Texas,
a Texas corporation;
National Union Fire Insurance Co. of Pittsburgh, PA,
a Pennsylvania corporation;
Sphere Insurance Co. Ltd.;
United Pacific Insurance Co.,
a Washington corporation,
and Certain Underwriters at Lloyds, London
and London Market Insurance Companies,
*Defendants,*

*and*

EMPLOYERS REINSURANCE CORP.,
a Missouri corporation,
*Respondent - Cross-Appellant.*

9205-03083; A118185

135 P3d 450

Richard S. Pope argued the cause for appellant - cross-respondent. With him on the briefs were Verne W. Newcomb, Wayne D. Landsverk, and Newcomb, Sabin, Schwartz & Landsverk, LLP, and Robert M. Horkovich and Anderson, Kill & Olick, PC.

Richard R. Spirra argued the cause for respondent - cross-appellant. With him on the briefs were Cathy L. Croshaw and Luce, Forward, Hamilton & Scripps LLP, and Jeffrey V. Hill, Brad Lamb, and Zarosinski & Hill.

Gregory L. Baird and Gordon & Polscer, LLP, filed the brief *amicus curiae* for Complex Insurance Claims Litigation Association.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Landau, Judge.*

BREWER, C. J.

---

* Landau, J., *vice* Richardson, S. J.

## BREWER, C. J.

Plaintiff Cascade Corporation (Cascade) appeals from the judgment that the trial court entered on its claims against defendant Employers Reinsurance Corp. (ERC) for coverage under a commercial liability insurance policy that ERC issued to Cascade. Cascade sought coverage both for its expenses in defending administrative and judicial actions seeking to hold it liable for contamination to groundwater under and near its business property and for the expenses of remediating the contamination that was legally its responsibility. ERC provided excess coverage. Cascade has settled its claims against its primary insurers and against its excess insurers other than ERC.

The jury's verdict was for the full amount that Cascade sought for its past expenses that it had not recovered from the primary insurers. However, the trial court entered judgment for only a small percentage of that verdict, and it declared that ERC is liable only for the same small percentage of Cascade's future expenses. On appeal, Cascade asserts that those actions were erroneous. It also raises issues concerning prejudgment interest and attorney fees. In its cross-appeal, ERC argues that the trial court erred by entering judgment for Cascade in any amount and also raises an evidentiary issue. On appeal, we reverse and remand for entry of judgment in the full amount of the unrecovered expenses, for reconsideration of the amount of the award of attorney fees, and for an additional award of prejudgment interest; we affirm on the cross-appeal.

The underlying facts are not in dispute. We take them primarily from the trial court's opinion. Since the mid-1950s, Cascade has manufactured attachments for lift trucks at a location in Gresham. From 1961 to 1975 it used chlorinated solvents to clean metal as part of its manufacturing process. Those solvents have made their way into the soils and contaminated the groundwater under and near Cascade's plant, a result that, the jury found, Cascade did not expect. In the mid-1980s, various government agencies began investigating the groundwater contamination. In 1992, the Boeing Corporation, which has a manufacturing

plant that borders Cascade's, sued Cascade in federal court to recover the expenses for which Boeing was liable in cleaning up groundwater contamination on its property. The federal court determined that Cascade was responsible for 70 percent of Boeing's costs. *Boeing Co. v. Cascade Corp.*, 920 F Supp 1121 (D Or 1996), *aff'd in part, rem'd in part*, 207 F3d 1177 (9th Cir 2000).[1] That responsibility was in addition to Cascade's obligation to remedy the groundwater contamination on its own property.

Cascade incurred substantial expenses in order to defend the administrative and judicial actions and to remedy the contamination, and it will continue to incur additional expenses for some time to come. To recover those expenses, it made claims against all insurers that it could identify as having issued primary or excess liability policies that might cover Cascade's liability for the groundwater contamination. In 1992, after the insurers failed to resolve those claims to Cascade's satisfaction, it filed this action against the insurers, seeking both to recover its past expenses for defense and remediation and to obtain a declaration of their obligations for future expenses.[2] The case finally went to trial beginning June 30, 1997. Before trial, the parties agreed to use March 1, 1997, as the date for distinguishing between past and future expenses. All amounts that Cascade incurred before that date were past expenses that Cascade would seek from the jury, and all expenses after that date were future expenses that would be the subject of the declaratory judgment. Immediately before the trial began, Cascade settled its claims against all but one of the primary insurers for a total payment of $9,750,000.[3] It then reduced its claim for past

---

[1] On Cascade's appeal, the Ninth Circuit affirmed the district court's findings against Cascade; on Boeing's cross-appeal, it increased the judgment in favor of Boeing.

[2] The parties and the court use various terms to describe the categories of Cascade's expenses. We will use "expenses of remediation" or a similar phrase to refer to expenses that are covered by the liability limits of the applicable insurance policies and "expenses of defense" or a similar phrase to refer to expenses for which the insurers are potentially liable without limit.

[3] The primary insurers' policy limits totaled $7 million. The trial court concluded that the settlement included expenses of defense, which were not affected by the policy limits, as well as of remediation. The parties do not dispute that conclusion on appeal.

expenses incurred against the remaining primary and excess insurer to $3,846,682 to reflect the amount of the settlement. The trial court treated that reduction as a judicial admission that the settlement with the primary insurers was for past rather than future expenses, a conclusion that the parties do not challenge on appeal.

As a result of the settlement, the defendants at the trial were, with one exception, excess insurers. Before closing arguments, Cascade settled its claim against most of those insurers (the AIG defendants) for $14 million. The settlement agreement expressly provided that the settlement was solely for future expenses. The jury found by a special verdict that there was continuing damage to the groundwater between February 1961 and July 1970, that it was unexpected, and that it was the result of an occurrence during each of the relevant policy periods. In its verdict, the jury established Cascade's unpaid expenses in the amount that Cascade had requested and, in an extensive appendix to the verdict, determined which expenses were expenses of defense and which were expenses of remediation.[4] The next day the remaining primary insurer, a syndicate at Lloyd's of London, paid Cascade the $50,000 limits of its policy, reducing the amount owed under the verdict to $3,796,682. Thus, the court's judgment applied only to the two remaining excess insurers, ERC and the same syndicate at Lloyd's.

In entering judgment, the trial court relied on its understanding of *Lamb-Weston et al v. Ore. Auto. Ins. Co.*, 219 Or 110, 341 P2d 110 (1959), and concluded that the excess carriers who were not part of the settlement with the AIG defendants were liable only for the percentage of the remaining past expenses that the limits of their liability bore to the total limits of all of the excess liability insurers. Because the limits of all of the excess policies total $160,750,000, while the limit of ERC's policy is $5 million, that conclusion meant that ERC was liable for only 3.1104 percent of the jury's verdict, or $118,092. The court therefore entered judgment against ERC for past expenses of $118,092 and, in its declaratory judgment, declared that ERC is liable

---

[4] The jury found that the great majority of Cascade's expenses were expenses of remediation.

for 3.1104 percent of Cascade's future expenses until its policy limits are exhausted. The court retained jurisdiction to allocate the future expenses as the facts developed. It also awarded attorneys fees to Cascade only for work done after the settlement with the primary insurers, further reducing that amount to reflect the relatively small judgment that Cascade obtained. Finally, it refused to award prejudgment interest.[5]

Cascade first assigns error to the trial court's decision to apply the *Lamb-Weston* doctrine in entering judgment against ERC, a decision that led to a judgment that is only a minor portion of the insured unpaid past expenses that the jury found that Cascade had sustained. We agree with Cascade that the *Lamb-Weston* doctrine concerns the way in which insurers divide up a covered loss among themselves; it has no effect on each insurer's independent obligation to make the insured whole to the extent of its applicable policy limits. That conclusion follows from *Lamb-Weston* itself.

In *Lamb-Weston*, one of the plaintiffs, Lamb-Weston, Inc., had a tort claim made against it. Two insurance policies, each with liability limits of $10,000, covered that claim. The other plaintiff, St. Paul Fire and Marine Insurance Company, had issued one of the policies, while the defendant had issued the other. Lamb-Weston settled the tort claim for $3,400, using money that St. Paul provided in return for a loan receipt. Thereafter, Lamb-Weston and St. Paul sued the defendant, seeking to recover the amount that they had paid in the settlement. *Lamb-Weston*, 219 Or at 113-15.

The issue in *Lamb-Weston* was how to determine which insurer should pay when both covered the same loss. Each insurer had tried to anticipate the problem in its policy; each policy contained an "other insurance" clause whose purpose was to require another insurer to pay first. The trial court found in favor of St. Paul on the ground that the defendant was the primary insurer. On appeal, the defendant argued that, contrary to the trial court's conclusion, St. Paul's coverage was primary. For that reason, the defendant

---

[5] The court entered judgment against the syndicate at Lloyd's on a similar basis. Cascade and the syndicate settled the case during the course of the appeal, leaving ERC as the sole defendant that had not settled.

insisted, it was not liable until St. Paul paid its policy limits, which it had not done. After discussing a number of relevant cases, the Supreme Court rejected the approach of attempting to find one insurer to be primary and another secondary. It concluded that attempting to apply the "other insurance" provision of one policy while rejecting that of another was "like pursuing a will o' the wisp." *Id.* at 122. There simply was no legal basis for concluding that one policy should yield to the other. The only way to resolve the conundrum was to require each insurer to contribute to the insured's loss in proportion to its share of the total policy limits. Because in *Lamb-Weston* the two insurers' policy limits were identical, the defendant was liable for one-half of the settlement, and St. Paul was liable for the other half. *Id.* at 122, 128-29.

*Lamb-Weston*, thus, was essentially a dispute between insurance companies about which should pay the loss. St. Paul had paid the insured's full loss and that loss was within both insurer's policy limits. The court began by noting that the issue was "of importance only as between the insuring companies" because "it must be conceded by each insurance company that if the other was not an insurer against this occurrence then it would be liable for the full amount." *Id.* at 117. The court then quoted with approval from a California case that emphasized that neither insurer was the beneficiary of the other's contract and neither had any contract right against the other; rather, both insurers had contractual obligations with respect to the same risk and were concurrently liable for it. *Id.* at 124-25 (quoting *American Automobile Ins. Co. v. Seaboard Surety Co.*, 155 Cal App 2d 192, 318 P2d 84 (1958)). As the Oregon court stated, the only issue involved in the case was who would pay Lamb-Weston's loss. There was never any question that Lamb-Weston would, in fact, be paid. Thus, from the perspective of the insurers, the existence of other insurance is purely fortuitous. One insurer cannot expect there to be another applicable policy covering the same risk; rather, in issuing its policy, each insurer has to assume that it will be liable for any loss to the full extent of the policy limits. To the extent that there is

other applicable insurance, each insurer will receive a potential windfall that reduces the exposure that it would otherwise face.

Lamb-Weston did not involve a settlement between the insured and some but not all insurers in which the settling insurers paid less than the full loss, leaving the remaining insurers to cover the deficiency. Its underlying principle, however, is that each insurer is fully liable to the insured. Despite that principle, the trial court applied the Lamb-Weston rule of pro rata apportionment in this case. In doing so, it used the policy limits of the settling excess insurers— who, because of the settlement, were not subject to the judgment—to determine the liability of the remaining excess insurers. In entering judgment against ERC, the court added the total policy limits of all of the excess insurers, including the Lloyd's syndicate and the settling AIG defendants, to arrive at the percentage of Cascade's loss that ERC should pay. After reducing the jury's verdict by the $50,000 that the remaining primary insurer paid after the verdict, the total verdict in Cascade's favor was $3,796,682. Following its understanding of Lamb-Weston, the court entered judgment against ERC for 3.1104 percent of that amount, or $118,092.

The trial court's decision was erroneous because it did not require ERC to pay Cascade's loss up to its policy limits. The purpose of the Lamb-Weston analysis is to allocate responsibility among those insurers whose policies are available to pay the claim; it does not permit an insurer to pay less than the limits of the applicable policy, leaving the insured with a loss for which there is no coverage. That conclusion is implicit in the reasoning of Lamb-Weston and finds additional support in subsequent cases.

Like Lamb-Weston itself, later cases focused on how much of the insured loss each insurer would pay. In cases that involved the additional issue of stacking policy limits, the court made it clear that an insured is entitled to recover its actual loss up to the limits of the insurers' policies. In Smith v. Pacific Auto. Ins. Co., 240 Or 167, 400 P2d 512 (1965), the Supreme Court held that the seriously injured insured was entitled to the combined limits of the policies,

explaining that, "[u]nder the *Lamb-Weston* formula, the various carriers must prorate their share of the loss, not their share of one carrier's limits." *Id*. at 173.[6] *Lamb-Weston*, that is, does not excuse insurers from complying with their obligations toward their insured. That conclusion is a corollary of the fact that, in the absence of other insurance, each insurer would be liable to the full extent of its policy limits. As the court stated, there was no reason to deny the insured the benefits for which he contracted simply because he also had rights under another person's insurance. *Id*. at 173.

The court later made it clear that an insurer must pay the limits of its liability even without regard to what another insurer has paid. In *Thurman v. Signal Insurance Co.*, 260 Or 524, 491 P2d 1002 (1971), the plaintiff was seriously injured in an accident with an uninsured motorist. Two policies covered her injuries, one issued by Oregon Automobile Insurance Company (Oregon) and one by the defendant. Each policy contained uninsured motorist coverage with limits of $10,000. The parties and the Supreme Court appear to have assumed that the plaintiff's injuries were greater than $20,000, the combined limits of the two policies. Oregon paid the plaintiff $10,000, the limits of its policy. The plaintiff then sued the defendant, seeking an additional $10,000. Both policies had other insurance provisions that the court, following *Lamb-Weston*, refused to apply. However, the policies also contained anti-stacking provisions that were functionally identical as applied to the plaintiff's claims. The provision in the defendant's policy stated:

> " '[I]f the insured has insurance available to him under more than one uninsured motorist provision, any damages shall not be deemed to exceed the higher of the applicable limits of respective coverages, and such damages shall be prorated between the applicable coverages as the limits of each coverage bears to the total of such limits.' "

*Thurman*, 260 Or at 532 (court's interpolations deleted). The court found no basis for saying that the anti-stacking provisions were not binding. As a result, the plaintiff's total

---

[6] The proration, of course, was between insurers who had not settled with the insured and who thus remained potentially liable for the loss to the extent of their policy limits.

entitlement to a recovery from the insurers for its damages was limited to $10,000, with each insurer liable under *Lamb-Weston* for half of that amount. *Id.*

Despite the conclusion that the plaintiff was entitled to a total of only $10,000, which she had already received from Oregon, the court refused to relieve the defendant of its independent liability to her. Rather, it held that the defendant owed the plaintiff $5,000, the maximum amount for which it was liable after application of the anti-stacking provision. Oregon's payment of more than the maximum for which it was liable under those provisions was a matter purely between the plaintiff and Oregon. It had no effect on the plaintiff's claim against the defendant. *Id.* at 533. Rather,

> "while it is necessary, in determining each insurer's *liability*, to examine the liability of the other insurer as provided by its policy, there is nothing in either policy which requires that the liability it imposes be determined or affected by how much the other insurer *pays*. It appears to us that *each insurer may pay what it pleases, whether less or more than it is obligated to pay, without affecting the other insurer's obligation under its contract.*"

*Id.* at 535 (first and second emphasis in original, third emphasis added). As a result, the defendant remained liable for $5,000, its share of the plaintiff's loss. *Id.* at 536.

Under the court's analysis in *Thurman*, the anti-stacking provisions reduced each insurer's liability—which is another way of saying each insurer's policy limits—to its proportionate share of the highest policy limits. Thus, as a result of the anti-stacking provisions, each insurer's policy limits were no longer $10,000 but had become $5,000. Each insurer remained obligated to the plaintiff for that amount without regard to what the other insurer did. The fact that the plaintiff had received more from Oregon than she was entitled to receive did not affect the defendant's independent obligation to her.[7]

---

[7] The court subsequently held, under similar facts, that an insurer that paid more than its reduced policy limits could recover the overpayment from its insured. *Guthrie v. State Farm Mut. Ins.*, 269 Or 14, 522 P2d 896 (1974).

It is clear after *Thurman* that, under *Lamb-Weston*, an insurer's liability to its insured is based on the insurer's direct obligation to its insured, not on what other insurers may owe or pay. *Lamb-Weston* provides a mechanism for insurers to determine among themselves how much each must contribute to the insured's loss, but it does not affect their duty to make the insured whole up to the limits of their policies. In the absence of an effective anti-stacking provision,[8] the existence of other insurance has no effect on an insurer's obligation to its insured. Even with an anti-stacking provision, the only effect of the other insurance is to reduce the policy limits. In all circumstances, an insurer must pay up to the limits of its policy. As the court noted in *Lamb-Weston*, if there were no other insurance the insurer would be liable to the insured for the entire loss up to its policy limits; the existence of other insurance does not affect that obligation. One insurer's overpayment does not reduce the obligation of other insurers to the insured. By the same reasoning, one insurer's reasonable settlement with the insured also does not reduce another insurer's obligation. *Lamb-Weston* applies among insurers; it does not affect their obligations to the insured. The very foundation of *Lamb-Weston* is invalidating competing "other insurance" clauses that attempt to reduce the insurer's obligation.[9]

ERC argues that, even if this conclusion is correct when the insured sues only one insurer, it does not apply when the insured sues more than one. In that situation, according to ERC, the insured is entitled only to the proportionate amount from each insurer. ERC explains that

"[t]he insured has the option to either: (1) seek payment from only one insurer for the entire amount of the loss (up to the insurer's policy limits) and let that insurer obtain contribution from the other insurer(s) for their proportionate share of coverage; or (2) sue all of the insurers whose

---

[8] The parties do not suggest that there are any applicable anti-stacking provisions in the policies at issue.

[9] Because of our conclusion that Cascade is entitled to prevail under a proper construction of the *Lamb-Weston* doctrine, we do not need to consider its argument that ORS 465.480 mandates the same result. For the same reason, we do not need to consider the arguments that *amicus* Complex Insurance Claims Litigation Association makes concerning the applicability of that statute.

policies provide concurrent coverage for its loss, in which case the court apportions liability among all of the insurers providing coverage for the loss, and the policyholder is entitled to recover from each insurer only that insurer's proportionate share of liability."

Because Cascade chose the second option, ERC says, it may not recover more from ERC than ERC's proportionate share of the total coverage.

The primary problem with ERC's argument is that there is no legal or logical support for it other than the apparent happenstance that the reported cases involve actions against single insurers. Nothing in the courts' analyses is based on that fact. As we have emphasized, under *Lamb-Weston*, each insurer is liable *to the insured* for the full amount of its coverage; the foundation of the doctrine is invalidating the "other insurance" clauses that would limit that liability. The question then becomes determining what benefit each insurer will receive from the fortuity that other insurance covers the same loss. Resolving that question led the court to require pro rata apportionment; that is, the purpose of apportionment was to solve an issue among the insurers. There is nothing about the *Lamb-Weston* analysis that depends on, or even tangentially relates to, the number of insurers that the plaintiff has sued. If more than one insurer will be subject to the trial court's judgment, the court will take its relative liability into account in order to avoid the plaintiff receiving a recovery that is greater than its loss. However, if some insurers have settled with the plaintiff or have otherwise been dismissed before the entry of judgment, or if the loss is greater than the defendant insurers' limits, the judgment must ensure that the insured receives full recovery for the loss up to the limits of the liability of the insurers who will be subject to the judgment. Any other result would give those insurers' other insurance provisions an effect that *Lamb-Weston* does not permit.

There are also practical problems with ERC's argument. The most obvious is that, even if the plaintiff sues only one insurer, that insurer can implead the others, thus producing the same procedural situation as if the plaintiff had originally sued them all. *See* ORCP 22 C. Under ERC's

analysis, that would limit the plaintiff's potential recovery against all. It is not clear why the insured's rights should depend on whether an insurer decides to seek contribution from other insurers in the original action or in a separate one. In addition, ERC's argument would discourage a settlement with fewer than all insurers because a settlement for less than the policy limits would prevent the insured from ever recovering the full insured amount of its loss.[10] That would be the case even if some insurers had defenses that were not available to others, or if some insurers were more forthcoming in negotiations than others; either situation could make a limited settlement a prudent action for the insured. In this case, for example, the AIG defendants had asserted that a pollution exclusion in their policies absolved them of liability, a defense that was not available to ERC. ERC's argument fails both legally and practically.

In its second assignment of error, Cascade asserts that the trial court's award of attorney fees is inadequate. We normally review the amount of an award of attorney fees for abuse of discretion. However, when the trial court bases its award on a legal conclusion, we review both the conclusion and the award for errors of law. *Stocker v. Keith*, 178 Or App 544, 547, 38 P3d 283 (2002). In this case the trial court gave significant weight, in determining the amount of its award, to the small size of the judgment that Cascade recovered and to the court's conclusion that Cascade was not entitled to fees for work performed before the settlement with the primary insurers. Because we have held that Cascade is entitled to a substantially larger judgment, the trial court's reliance on the first consideration was erroneous.

The second consideration was based on the fact that, before the settlement, Cascade did not seek past damages against the excess insurers but only a declaration of their liability for future expenses. The court apparently concluded that ORS 742.061 provides for an attorney fee against an insurer only if the insured recovers a money judgment, not if

---

[10] Indeed, ERC suggests that Cascade brought the problem upon itself by settling with the other insurers for less than their policy limits. It does not, however, point to any action of the trial court finding those settlements to be unreasonable, nor does it assign error to any decision relating to that issue.

it obtains only a declaratory judgment that may lead to a requirement that the insurer pay money in the future. *See McGraw v. Gwinner*, 282 Or 393, 400, 578 P2d 1250 (1978). However, Cascade did obtain a money judgment in this case. It is entitled to an award of attorney fees for the work that was necessary in order to obtain that judgment. The fact that much of that work occurred when Cascade was making claims for a money judgment only against the primary insurers is irrelevant. An insured is entitled to attorney fees for work done before commencing an action. *Farmers Ins. Co. v. Trutanich*, 123 Or App 6, 16, 858 P2d 1332 (1993). The statute places no limitation on when the attorney performs the services; the only issue is whether they were part of the work that led to the insured's obtaining the judgment. Because the trial court relied on two erroneous considerations in determining the amount of its award of attorney fees, we reverse the award and remand for the entry of a new one.

In its final assignment of error, Cascade objects to the trial court's refusal to award prejudgment interest from the dates that it incurred expenses for defense and remediation. The court awarded only a limited amount of prejudgment interest against ERC, running from a period that began some time after the jury's verdict. As Cascade points out, under ORS 82.010, interest on damages for breach of contract begins to run when "the (1) the exact amount of damages is either ascertained or readily ascertainable; and (2) the time from which the interest runs is easily ascertained." *Krieg v. Union Pacific Land Res. Corp.*, 269 Or 221, 234, 525 P2d 48 (1974). Cascade argues that the jury in its verdict determined both the amount of each item that Cascade paid for expenses of defense and remediation and the date on which it incurred that item. Thus, both the amount of Cascade's damages and the times from which they run are readily ascertainable. We agree with Cascade as to the amount of each item. The time from which the interest against ERC began to run, however, is not so clear.

As we noted above, until its settlement with the primary insurers, Cascade sought only a declaratory judgment against the excess insurers. Until that time, Cascade took the

position that the amounts owed for past defense and remediation expenses were within the limits of coverage of the primary policies. As an excess insurer, ERC was not obligated for Cascade's past defense and remediation expenses until Cascade exhausted its coverage under the primary policies. Thus it was only at the time of the settlement with the primary insurers, which, contrary to Cascade's previous position, resulted in some of those expenses remaining unpaid, that ERC became obligated for the unpaid expenses. At that time, those unpaid expenses became due from ERC within the meaning of ORS 82.010(1)(a). On remand, the trial court shall award prejudgment interest from July 3, 1997, the date of the settlement with the primary insurers.

The primary issue on ERC's cross-appeal involves the extent to which Cascade's expenses in responding to the groundwater contamination were expenses of defense or expenses of remediation.[11] Defendants are liable for expenses of remediation only to the limits stated in their policies, but there is no limit to their liability for expenses of defense. Cascade did not originally distinguish between the two categories of expenses in its pleadings; it simply sought to recover all of its expenses as damages. Defendants, including ERC, filed an ORCP 21 motion against Cascade's amended complaint in which, among other things, they asked the court to require Cascade to distinguish between defense and remediation expenses. The trial court granted the motion, but at the same time stated, "I'll just indicate [that] I'll permit an amendment of the pleading if it appears that plaintiffs thought it was defense and it turns out a better argument can be made that it is more remedial than defense." Cascade then

---

[11] ERC also assigns error to the court's entering any judgment in favor of Cascade on the ground that Cascade had received more in settlements than the past expenses that the jury awarded and to the trial court's entry of any award of attorney fees. The first argument depends on ERC's assertion that the settlement with the AIG defendants was for past expenses. However, the settlement expressly provided that it was for future expenses, and we find no reason to dispute that characterization. ERC relies in part on how Cascade credited the money that it received under the settlement for internal bookkeeping purposes. That action of one party, however, is irrelevant to the express intent of all of the parties as they stated it in their agreement. That express intent in itself defeats ERC's characterization of the settlement proceeds and, with it, ERC's assignment of error. ERC's attack on the award of attorney fees depends on its attack of the entry of judgment and falls with it.

filed its second amended complaint, in which it alleged that its expenses of defense through January 31, 1994, were $4,912,000, while its expenses for liabilities incurred were $372,000. Shortly before the trial, Cascade amended the complaint by interlineation to increase those amounts to $10,200,517 and $4,986,105, respectively.

The trial court expressly recognized the tentativeness of any allocation of expenses in its ruling on the ORCP 21 motion. Cascade expressed that tentativeness in the subparagraph of the second amended complaint in which it alleged the expenses of remediation. Cascade pleaded that, "[t]o the extent that certain alleged costs categorized as defense costs may be determined not to be defense costs, then Cascade claims them as the costs of damages described in this subparagraph." Thus Cascade's pleading itself made it clear that the allocation was subject to modification.

The settlement with the primary insurers occurred immediately before the trial began. During the trial, Cascade asserted, in contrast to its previous position, that the great majority of its expenses were for remediation rather than defense. It did not move to amend the second amended complaint again but, instead, apparently relied on its allegation that anything that it could not prove to be an expense of defense was an expense of remediation. In response, ERC sought to use Cascade's second amended complaint as an absolute defense to liability by showing that Cascade had either made a judicial admission that its past expenses of remediation were less than the liability limits of the primary insurers or that it was estopped from denying that fact. In the alternative, ERC sought to use the pleadings to impeach one of Cascade's witnesses. The trial court denied both requests, and ERC assigns error to those actions.[12]

---

[12] ERC attacks at least three different actions by the trial court in its first assignment of error: the trial court's failure to rule that Cascade's pleadings constituted a judicial admission; its failure to rule that they effected an estoppel; and its failure to permit ERC to use the pleadings to cross-examine one of Cascade's witnesses. It is questionable whether combining attacks on multiple rulings in the same assignment complies with the separate statement requirement of ORAP 5.45(2). Because the assignment fails in any case, we do not need to decide whether ERC properly assigned error.

■ ■ A statement of fact in a pleading that has not been superseded is a judicial admission that the fact as stated exists. *McGanty v. Standenraus*, 321 Or 532, 538-39, 901 P2d 841 (1995); *Yates v. Large*, 284 Or 217, 223, 585 P2d 697 (1978). The foundation of an equitable estoppel is preventing a person from proving an important fact to be different from what the person previously asserted it to be when another person reasonably relied on the original assertion. *Stovall v. Sally Salmon Seafood*, 306 Or 25, 33-34, 757 P2d 410 (1988). An essential element of both doctrines is that the person to be foreclosed has made an allegation or representation of fact.

Cascade did not make the kind of representation that either doctrine contemplates. Although Cascade alleged that part of the money that it sought was expenses of defense and that another part was expenses of remediation, it also alleged that, to the extent that expenses categorized as defense expenses turned out not to be defense expenses, it claimed them as expenses of remediation. The breakdown between the categories that Cascade alleged in the second amended complaint, thus, was not an admission that the defense expenses it claimed were only defense expenses. Rather, the breakdown was flexible, and the second amended complaint permitted Cascade to change it based on the evidence presented without first amending the complaint. Given the nature of the expenses at issue, which often involved actions taken both to determine the extent of contamination and to remedy that contamination, deciding what percentage of a particular expense was defense and what percentage was remediation was necessarily imprecise. The second amended complaint, thus, did not allege a fact that was inconsistent with the facts that Cascade sought to prove at trial, and the court did not err in refusing to treat it as a judicial admission or as the basis for an estoppel.

■ As noted, ERC also asserts that the trial court should have permitted it to use Cascade's second amended complaint as a basis for cross-examining one of Cascade's witnesses concerning the allocation of its expenses between expenses of defense and expenses of remediation. Although a superseded pleading is no longer a judicial admission, an opposing party may use it as evidence to establish its case. It is not conclusive, and the pleading party may explain it.

*Yates*, 284 Or at 233.[13] The first problem with ERC's argument is that the second amended complaint has not been superseded. Although Cascade amended that complaint by interlineation, ERC apparently sought to use the interlineated complaint for cross-examination. Ignoring that problem, and even without the rule, ERC could assert that the second amended complaint was an admission of a party-opponent under OEC 801(1)(b)(A). Assuming that the pleading qualifies for that purpose, the trial court did not abuse its discretion in excluding the evidence. As previously discussed, Cascade did not unequivocally allege that expenses belonged in one category or the other but only gave a tentative breakdown of the expenses. The court, when it required Cascade to do so, recognized that the evidence might prove to be different from the allegations. In those circumstances, the evidentiary value of the breakdown that Cascade alleged was, at best, limited. In addition, the court precluded Cascade's witness from giving an opinion about the category in which a particular expense belonged, further reducing the pleadings' value as evidence. On the other hand, as the court noted, allowing the use of the pleadings would bring in collateral issues concerning the reasons that Cascade categorized expenses for pleading purposes in the way that it did, something that had little or nothing to do with the decisions that the jury had to make. The trial court did not err.

On appeal, reversed and remanded with instructions to enter modified judgment in favor of Cascade for past expenses in amount of $3,796,682, to declare ERC liable for future expenses beyond those that other insurers have paid until its policy limits are exhausted, to reconsider award of attorney fees, and to award prejudgment interest from July 3, 1997; otherwise affirmed. Affirmed on cross-appeal.

---

[13] At one point, we suggested that that rule may have lost its force because the Oregon Rules of Civil Procedure no longer require that pleadings be verified. *See O'Gara v. Kaufman*, 81 Or App 499, 502-03, 503 n 3, 726 P2d 403 (1986). More recently, however, we have treated the rule as still in force. *See Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 253-54, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005).