Argued and submitted October 18, 2007, affirmed October 15, 2008

HANNA LIMITED PARTNERSHIP,
an Oregon limited partnership,
*Plaintiff-Respondent,*

*v.*

WINDMILL INNS OF AMERICA, INC.,
an Oregon corporation,
*Defendant-Appellant.*

Douglas County Circuit Court
03CV3903CC; A128969

194 P3d 874

152

James N. Westwood argued the cause for appellant. With him on the briefs were Stoel Rives LLP and P. David Ingalls and Hornecker Cowling Hassen & Heysell LLP.

Lisa E. Lear argued the cause for respondent. With her on the brief were Stephen B. Hill, Renee E. Rothauge, Stephen F. Deatherage and Bullivant Houser Bailey PC. With her on the reply brief were Stephen B. Hill and Bullivant Houser Bailey PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

This declaratory judgment action involves interpretation of a long-term lease between a landlord, plaintiff Hanna Limited Partnership (Hanna), and a tenant, defendant Windmill Inns of America, Inc. (Windmill). The primary dispute concerns the meaning of provisions specifying methods of calculating rent for five-year lease terms. The trial court ruled that the lease unambiguously requires that rent be stated as a fixed amount at the beginning of each term, not an amount that could vary during the term. The court instructed the jury accordingly, and the jury found that Windmill's appraisal, which partially determined rent based on Windmill's annual profits, did not comply with the lease.

Windmill appeals from the ensuing judgment and a supplemental judgment awarding Hanna attorney fees. It raises two assignments of error as to the general judgment. First, Windmill contends that the lease is ambiguous as to whether, when rent is determined by an appraisal, the appraisal must state the amount of rent in "one computation." It argues accordingly that the trial court should not have instructed the jury that the lease was unambiguous on that point but rather should have allowed the jury to decide whether the lease imposed that requirement. Second, Windmill contends that the trial court erred in denying its motion for a directed verdict or dismissal based on section 20 of the lease. Windmill's third assignment of error relates to the attorney fee award, which Windmill contends was excessive.

As to the first assignment of error, we conclude that the trial court did not err in determining that the lease requires that rent be stated as a fixed amount. We reject the second assignment of error likewise because Windmill failed to establish that its appraiser determined that rent for the term should be "lower." Finally, we reject Windmill's third assignment of error, concerning attorney fees. Accordingly, we affirm.

We begin with a description of the lease. In 1976, Hanna entered in a long-term lease with Windmill's predecessor in interest, Hero's Restaurant, Inc., for property on which Hero's built a hotel and restaurant. The lease is

for 25 years, divided into five-year terms, with an option to renew for three additional five-year terms. Section 3 of the lease sets out the rent to be paid for the first five-year term. Under section 3, that initial rent "shall be construed as 'base rent,' [and] there shall be increases in said base rent at the commencement of each additional five year term (that is four times during said twenty-five year lease term and at the commencement of each additional five year term thereafter * * *)." Section 20 addresses the calculation of rent for the remaining five-year terms.[1]

The first paragraph of section 20 provides for a 10 percent increase in the rent at the beginning of the second

---

[1] Section 20 provides as follows:

"At the commencement of each five year term * * *, the immediately preceding monthly rent shall be increased, for each month of the then beginning subsequent five year term, by ten percent of the monthly rent, which was applicable for the immediately preceding five year period. That is to say, one computation shall be made at the commencement of each of said five year dates, and, the increase of ten percent shall be applicable to the five year term next succeeding * * *. The ten percent computation shall not be made monthly, but only once each five years * * *.

"Starting with the ten percent increase in rent for the third five year term * * *, if either party is not satisfied with the ten percent increase applicable to the five year term then beginning to which the ten percent computation is made as above set out, then such party which is not satisfied shall notify the other * * *. Such party, giving notice of dissatisfaction, shall promptly select an appraiser to determine what the reasonable rent should be * * * for the said five year term to which rental rate the dissatisfied party objects. As soon as the appraiser's determination is made, the written report by the appraiser shall be given to each party. If the appraiser determines the rent should be lower, then the appraiser's determination shall control for the five year period in question.

"If, however, the appraiser determines the rent should be higher, then such higher appraisal computations shall control for the five year term in question unless the other party to this Lease, who did not retain the first appraiser, objects. In such event, the objecting party shall forthwith retain an appraiser of its choice who then makes his written report and copies forthwith are given to each party. The two appraisers * * * shall then promptly endeavor to arrive at a mutually agreeable rental rate for the five year period in question. If they agree, then that shall control. If they do not agree, then the two appraisers * * * shall appoint a third appraiser who shall proceed in like manner * * * and the decision of any two, or all three, of the said three appraisers * * * shall control for the five year period in question.

"* * * * *

"Notwithstanding provisions * * * with respect to the appraisal procedure * * *, in no event shall there be any determination of rent * * * which would reduce the rent to a figure less than the base rent provided for in [section] 3 above."

term. Specifically, it states that, for the second and subsequent terms, including the option terms, "the immediately preceding monthly rent shall be increased, for each month of the then beginning subsequent five year term, by ten percent of the monthly rent, which was applicable for the immediately preceding five year period." There will be "one computation * * * at the commencement of each of said five year dates," and the "increase of ten percent shall be applicable to the five year term next succeeding * * *." Finally, "[t]he ten percent computation shall not be made monthly, but only once each five years at the commencement of each five year term * * *." For convenience, we refer to that default method as the "percentage method" for calculating rent.

The second paragraph of section 20 authorizes an appraisal process as an alternative method of calculating rent for any term beginning with the third term. It provides that, at the beginning of the third term,

> "and thereafter on each occasion of a ten percent increase occurring under the provisions contained in this [section] 20, if either party is not satisfied with the ten percent increase applicable to the five year term then beginning * * *, then such party which is not satisfied shall notify the other * * *. Such party, giving notice of dissatisfaction, shall promptly select an appraiser to determine what the reasonable rent should be for the land area covered by this Lease for the said five year term to which rental rate the dissatisfied party objects. As soon as the appraiser's determination is made, the written report by the appraiser shall be given to each party. If the appraiser determines the rent should be lower, then the appraiser's determination shall control for the five year period in question."

The third paragraph of section 20 addresses what happens if the appraiser determines that "the rent should be higher."[2] In that event, "such higher appraisal computations shall control for the five year term in question unless the

---

[2] The lease does not identify the comparison point to be used in deciding whether the rent is "lower" or "higher." That is, it does not specify whether the appraiser's rent determination should be compared to the prior term's rent, the rent for the current term as calculated using the percentage method, or some other calculation of rent. In its briefs, Windmill refers to its appraiser's determination as "lower" than the rent for the prior term. For purposes of our analysis, we need not decide whether that is correct.

other party to this Lease, who did not retain the first appraiser, objects. In such event, the objecting party shall forthwith retain an appraiser of its choice who then makes his written report * * *." After the second appraiser's report, the two appraisers must "promptly endeavor to arrive at a mutually agreeable rental rate for the five year period in question." If the two agree, then "that shall control." If they do not agree, they must select a third appraiser. The agreement of at least two of the three appraisers "shall control for the five year period in question." We refer to that process as the "appraisal method" for determining rent.

The final paragraph provides that, whatever happens "to resolve ten percent increase questions, in no event shall there be any determination of rent * * * which would reduce the rent to a figure less than the base rent provided for in [section] 3 above." Thus, the base rent set out in section 3 is just that—the minimum rent that can be charged during the life of the lease.

We proceed to describe the evolution of the present dispute, which concerns the sixth term (2003-08), the first of the three terms under the option.[3] Windmill notified Hanna that it wished to invoke the appraisal method and would hire an appraiser. Hanna, in turn, hired its own appraiser, who determined that the monthly rent should be $15,000, for an annual rent of $180,000. Approximately seven weeks later, Windmill's appraiser advised that the rent should be based in part on Windmill's revenues—specifically, six percent of hotel room rentals, three percent of food and beverage revenues, and six percent of miscellaneous revenues. If that approach had been used during the final year of the fifth term, the rent for that year (2002) would have been $140,269. Windmill's appraiser concluded that the rent for each year of the sixth term should be based on annual revenues, subject to a "minimum rent of $140,000 based on [2002] operating results."[4]

---

[3] Although the lease is dated November 23, 1976, and provides for five-year terms, the parties appear to agree that the term at issue began in 2003.

[4] The appraisal report did not explain *when* any rent above the minimum $140,000 *per year would be calculated* and paid—whether at the end of each year or the end of the term. The parties appear to assume that the calculation would be done annually. We need not resolve the question. It is enough, for purposes of our

After receiving the report, Windmill sent Hanna an e-mail stating that its appraiser had "determined that the reasonable rent is $140,000 per year" and that it would adjust the monthly rental accordingly. Hanna responded, demanding that Windmill's appraiser and its own appraiser meet "to complete the process outlined in [section] 20" of the lease. Until the rent issue was resolved, Hanna further asserted, Windmill was required to pay at least $13,750 per month (reflecting a 10 percent increase, as calculated under the percentage method), not $11,689 as Windmill contended (the prorated amount based on 2002 revenues under its appraiser's proposal). Windmill replied that its appraiser's report controlled under section 20 because it was the first party to express dissatisfaction with the percentage method, and its appraiser's rent determination was "lower." Windmill further asserted that it had overpaid rent when it paid rent for the current term (the sixth) at a rate higher than the rent determined by its appraiser. In Windmill's view, under a lease provision providing for payment adjustments if the appraisal method were not completed before the start of a new term, it was entitled to a refund of the overpayment.

Hanna sued, seeking declaratory relief and claiming breach of contract. In a summary judgment motion, Hanna asserted that Windmill's appraisal was invalid. Hanna contended that Windmill's appraiser used a formula that would produce rents that varied over the course of the term, rather than, as required by the lease, a rent that would be fixed at the beginning of the term. Windmill filed a response and its own motion for summary judgment, in which it contended that no such limitation existed in the lease. It argued that its appraisal was valid because section 20 left the rent determination to the appraiser's professional judgment. The trial court denied both parties' motions without explanation.

Before trial, the parties disputed whether the lease is ambiguous and what extrinsic evidence, if any, could be offered to show the parties' intent. The trial court ruled that section 20 is "not ambiguous as to the fact of providing that there will be one computation for the 5-year term." During

analysis, that Windmill's appraisal left uncertain at the beginning of the term the total rent payable during the term.

trial, at the close of the evidence, Windmill moved for a directed verdict and for dismissal, again urging that, as a matter of law, its appraiser's determination of rent controlled because it was the first party to express dissatisfaction with the percentage method and its appraiser's determination was "lower." The trial court denied that motion.[5]

Hanna prepared a jury instruction that reflected the court's ruling on the fixed rent issue. Over Windmill's objections, the court instructed the jury as follows: "Section 20 unambiguously provides for one rent determination for each new five year lease term."

The jury returned a verdict in which it found that Windmill's appraisal report did not comply with section 20 of the lease. The jury also determined that Windmill was required to obtain a new appraisal and, if the parties could not agree on rent, to submit the dispute to a third appraiser. Given its findings, the jury was not required to decide Hanna's alternative breach of contract claim. The trial court entered a judgment reflecting that verdict and, in a supplemental judgment, awarded Hanna its costs, a prevailing party fee, and $265,688.50 in attorney fees. Windmill timely appealed from both judgments.

On appeal, Windmill makes three assignments of error. First, Windmill contends that the trial court erred in concluding that the lease "is not ambiguous as to the fact of providing that there will be one computation [of rent] for the 5-year term." Windmill maintains that only paragraph one of

---

[5] In response to other arguments before trial, the trial court also ruled that section 20 is ambiguous "as to whether both parties may give a notice of dissatisfaction." The parties and the trial court also addressed before trial the meaning of the provision of section 20 that allows a party who is dissatisfied with the percentage method to retain an appraiser, whose determination would control if the rent established by the appraisal was "lower." Hanna maintained that the reference to the "dissatisfied" party did not mean the first party to express dissatisfaction, but that both parties could be dissatisfied and both could retain appraisers. At a minimum, Hanna argued, the provision was ambiguous. Windmill, however, contended that the provision was clear and unambiguous—that the appraisal obtained by the first party to express dissatisfaction controlled if that appraisal was "lower." Here, in Windmill's view, its appraisal was "lower" because the $140,000 annual rent that it would be required to pay over the term was less than what it had paid in the prior term and was also less (necessarily) than what it would pay if the prior term's rent were increased by 10 percent. Thus, Windmill argued that, even if "lower" were ambiguous, under the facts of this case that was immaterial.

section 20 imposes a "one computation" requirement, that that paragraph addresses only the percentage method for adjusting rent from one term to the next, and that "[s]ection 20 is ambiguous with regard to the 'one rent determination' question." If the lease is ambiguous as to whether the "one computation" requirement also applies to the appraisal method, Windmill asserts, then the trial court should have allowed the jury to decide whether the lease required the rent to be determined as a fixed amount at the beginning of the term. In Windmill's view, the instruction that the lease unambiguously provides for one computation of rent all but directed the jury to find for Hanna, because the "instruction made it impossible for the jury to endorse the rent computation of Windmill's appraiser * * *." Windmill therefore seeks a new trial.

In its second assignment of error, Windmill contends that the trial court erred in denying its motion for a directed verdict or, in the alternative, dismissal, because, under the second paragraph of section 20, Windmill's appraiser's report controlled the determination of rent for the 2003-08 period as a matter of law. Windmill argues that the second paragraph of section 20 unambiguously provides that the first party to express dissatisfaction with the percentage method is entitled to have its appraiser's determination set the rent, if the rent determined by the appraiser is "lower"; that Windmill was the first to express dissatisfaction with the percentage method; and that its appraiser's report determined that the rent should be lower. The trial court denied Windmill's motion, concluding that the lease "is ambiguous as to whether both parties may give a notice of dissatisfaction." Windmill contends that, in fact, the lease "unambiguously operates to make [Windmill's] appraisal report * * * the controlling determiner of the 2003-2008 rent schedule" and that the trial court thus erred in denying Windmill's motion. Windmill asserts that, accordingly, we should remand for entry of judgment in its favor.

In its third assignment of error, Windmill argues that the trial court's award of over $265,000 in attorney fees to Hanna was an abuse of discretion. Windmill contends that the award is based on an hourly rate that exceeds what is

charged locally for similar services and that the award is excessive in relation to the amount that was in issue.

■ We begin with Windmill's first assignment of error, in which Windmill contends that the lease is ambiguous as to whether the rent for a five-year term had to be stated at the beginning of the term as "one computation"—*i.e.*, a fixed amount—and that the trial court erred in not submitting that question to the jury.[6] We conclude that the lease is not ambiguous and that, accordingly, the trial court did not err in its instruction to the jury.

■ The three-step process for contract interpretation is set out in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997). In the first step, the court examines the text of the disputed provision in the context of the contract as a whole and determines, as a matter of law, whether the provision is ambiguous. *Id.* at 361. If the provision is ambiguous, the second step is for the trier of fact to examine extrinsic evidence of the contracting parties' intent. *Id.* at 363. If the ambiguity remains after those two steps, "the court relies on appropriate maxims of construction." *Id.* at 364.

Regarding section 20, the parties agree that its first paragraph provides for a single 10 percent increase in rent at the beginning of each five-year term. That increase is to be based on "the immediately preceding monthly rent," that is, the rent *"which was applicable for the immediately preceding five year period."* (Emphasis added.) The clear intent of the provision is that the rent paid in month 60—the "immediately preceding" month—is the same rent paid for each of the prior 59 months of the term. Thus, the rent paid in each month of the term is an identical fixed amount. That reading of the first paragraph of section 20 is bolstered by section 3 of the lease, which provides for a "base rent" and "increases in said base rent *at the commencement of each additional five*

---

[6] Windmill's first assignment of error variously focuses on the trial court's determination that the lease unambiguously provides for a single rent amount to apply throughout each five-year term and on a jury instruction to that effect. The proper claim of error is the jury instruction, which had the effect of removing from the jury the question of the meaning of section 20 of the lease. The trial court's earlier "ruling" was the basis for the instruction but did not otherwise affect the conduct of the litigation or the rights of a party. *See Kuffel v. Reiser*, 268 Or 152, 157, 519 P2d 365 (1974) (to warrant reversal, a ruling must be wrong *and* prejudicial).

*year term.*" (Emphasis added.) Sections 3 and 20 contemplate that the rent will change at the beginning of the term and then remain fixed for the term.

Windmill contends, though, that the first paragraph of section 20 addresses only the percentage method for adjusting rent and not the appraisal method covered by the second and third paragraphs. It asserts that the trial court, in "concluding that the rent would have to remain fixed for the full five year period in *all* events, even where the parties determined the rent through appraisal, * * * forced [p]aragraphs 2 and 3 into [p]aragraph 1, a violence that does not withstand textual or contextual scrutiny."

Windmill's argument ignores the interrelationship between the first and second paragraphs of section 20. The percentage method set out in the first paragraph is not simply an alternative method for determining rent; it is the default method. Unless a party invokes the appraisal method set out in the second paragraph, the percentage method governs the calculation of rent for each term. And for the percentage method to work as a default provision, the rent for the immediately preceding term must be a fixed, identical amount each month. The percentage method could not be applied in a subsequent term if the rent for the immediately preceding term varied from month to month or year to year. That is because the percentage method requires a 10 percent increase from "the immediately preceding monthly rent," the same rent that "was applicable for the immediately preceding five year period." Even when the appraisal method was used for the preceding term, the lease structure expressly assumes that the rent for each month of that term does not vary. If the rent were to fluctuate during the term, the percentage method could not operate as the parties agreed. Windmill's interpretation of the lease therefore is not plausible.

It is also apparent that the second and third paragraphs of section 20, apart from the first paragraph, contemplate that the rent calculated by the appraisal method will result in an amount that is fixed—or at least ascertainable by the parties—at the beginning of each term. Paragraph two provides that if a party opts for the appraisal method and the

appraiser determines that the rent should be "lower," then that determination establishes the rent for the five-year term. Under paragraph three, the appraiser's determination also controls if it provides for "higher" rent, unless the other party objects and retains its own appraiser. Necessarily, then, in order to carry out the appraisal method, the parties must be able to determine at the beginning of the term whether the rent called for by an appraisal is "lower" or "higher." That is, the parties must be able to ascertain the rent to be paid so that they can make the required comparison. They simply cannot ascertain the amount of rent to be paid over the term if the appraisal in question states that the rent for the term is based on a formula, but the values to be plugged into the formula (and hence the result) are unknown and unknowable at the beginning of the term.

Here, the rent under Windmill's appraiser's report is not ascertainable at the beginning of the term. Over the course of the term, the annual rent would be $140,000, plus an amount based on Windmill's revenues from the preceding year. Thus, although the rent for each month of any given year would be fixed, the rent for the next 12 months would be adjusted based on the preceding year's revenues. Not only would the rent vary for each of the five years of the term, but also it would not be ascertainable at the beginning of the term because, at that time, Windmill's future revenues would not be ascertainable. It is simply not possible, given the variable nature of the rent under Windmill's appraiser's report, to determine at the outset of a term whether the rent for that term or for any month or year of that term is "lower" or "higher."

Although Windmill contends that the lease reasonably can be interpreted to allow an appraisal that states the rent as a variable, unknown amount, that interpretation is not consistent with the text of the lease. At oral argument, Windmill urged that the evaluation of whether the appraiser's determination of rent is "lower" or "higher" can be made by taking a snapshot approach—that is, by making the required comparison based on the appraiser's rent determination at the beginning of the term, even though the rent might increase or decrease over the course of the term. Section 20, however, provides for a comparison of rent for the

term, not for a comparison of rent at a single point during the term. The second paragraph of section 20 allows a party who is dissatisfied with the percentage method to select an appraiser "to determine what the reasonable rent should be * * * for the said five year term to which rental rate the dissatisfied party objects. * * * If the appraiser determines the rent should be lower, then the appraiser's determination shall control for the five year period in question." The third paragraph provides that, if "the appraiser determines the rent should be higher, then such higher appraisal computations shall control for the five year term in question unless the other party * * * objects." That paragraph goes on to establish a process for each party to retain an appraiser and for the two appraisers to try "to arrive at a mutually agreeable rental rate for the five year period in question." In context, therefore, "rent" refers to the rent for the five-year term. The evaluation of whether rent is lower or higher cannot be made without knowing the rent for the entire term. Thus, it is impossible to determine at the beginning of a term whether a variable rent is lower or higher.

■    In the context of its second assignment of error, Windmill further contends that its appraiser determined a "base rent" or minimum rent for the term that was "lower" within the meaning of section 20. Windmill argues, in effect, that for purposes of the appraisal method, it does not matter that the total amount of rent to be paid under an appraisal is variable, so long as the appraisal sets forth a minimum amount of rent to be paid. According to Windmill, the parties need not be able to ascertain at the beginning of the term what the *total* amount of rent to be paid over the term will be in order to apply the appraisal method under section 20.

Although Windmill makes that argument in the context of its second assignment of error, we address it here because, if correct, it would call into question our view that paragraphs two and three of section 20 support our conclusion that the lease requires the rent for a five-year term to be ascertainable at the beginning of the term. We reject Windmill's argument for two reasons.

First, Windmill's argument finds no support in the language of section 20. Rather, paragraph two of section 20

provides that, if the appraiser "determines the *rent* should be lower, then the appraiser's determination shall control for the five year period in question." (Emphasis added.) "Base rent" is a term that section 20 uses to refer to the rent charged during the first five-year term, as set forth in section 3 of the lease. Contrary to Windmill's position, nothing in the lease suggests that the phrase "base rent" also applies to a minimum rent to be paid under an appraisal that calls for a minimum rent—at whatever amount—plus a variable sum.

Second, Windmill cannot seriously contend that its appraiser's rent determination was "lower" because the variable sum above the "minimum" amount called for by its appraiser's report is not "rent." Windmill's references to that variable amount as "overages," an "add-on," and a "bonus" do not disguise the fact that the variable amount is part of the rent. The amount of "rent" under its appraiser's report is not a single computation and is not ascertainable at the beginning of the term. Accordingly, the appraisal report does not comply with the requirements of section 20.

The trial court correctly concluded that the text of section 20 unambiguously provides that the rent for a five-year term had to be stated at the beginning of the term as a fixed amount. Accordingly, it did not err in so instructing the jury.

Windmill's second assignment of error, concerning the denial of its motion for a directed verdict or dismissal, fails for related reasons. The second paragraph of section 20 provides that, if a party is dissatisfied with the rent as calculated under the percentage method, the party may give notice to the other party and retain an appraiser to determine the rent. If the appraiser determines the rent should be "lower," that determination controls for the five-year term. Windmill argues that the trial court erred in denying its motion because it was first to express dissatisfaction with the percentage method and because its appraiser's report determined that the rent should be "lower." However, we have already rejected Windmill's contention that its variable appraisal established a "lower" rent, given that the amount of

the rent cannot be determined and that "base rent" has a different meaning under the lease. Accordingly, we reject Windmill's second assignment of error.

■ Finally, we address Windmill's third assignment of error, challenging the trial court's award of over $265,000 in attorney fees to Hanna pursuant to a provision of the lease. The trial court made extensive findings in support of that award, addressing the factors listed in ORS 20.075(2).[7] Specifically, the court found that there was no dispute that the case was difficult; that, consistently with the testimony of Hanna's expert, the "locality for similar legal services" involved a "broader consideration than Douglas County," where the case was tried, and that the hourly rates and fees charged were reasonable; that the amount involved in the controversy was more than the rent for one five-year term, because rent for any one term could affect future rents, and that the stakes were raised further by Windmill's counterclaim and both parties' requests for attorney fees; and that Hanna's attorneys and paralegal "performed at a high level

---

[7] ORS 20.075(2) provides that, "in any case in which an award of attorney fees is authorized or required by statute," the court

"shall consider the following factors in determining the amount of an award of attorney fees * * *:

"(a) The time and labor required in the proceeding, the novelty and difficulty of the questions involved in the proceeding and the skill needed to properly perform the legal services.

"(b) The likelihood, if apparent to the client, that the acceptance of the particular employment by the attorney would preclude the attorney from taking other cases.

"(c) The fee customarily charged in the locality for similar legal services.

"(d) The amount involved in the controversy and the results obtained.

"(e) The time limitations imposed by the client or the circumstances of the case.

"(f) The nature and length of the attorney's professional relationship with the client.

"(g) The experience, reputation and ability of the attorney performing the services.

"(h) Whether the fee of the attorney is fixed or contingent."

Because any right to attorney fees in this case arose from the lease, rather than a statute, the trial court was not required to consider those factors. Neither party, however, suggests that the trial court abused its discretion by doing so. The trial court noted, in its letter opinion, that the parties had used the ORS 20.075 factors as guidelines in presenting their arguments.

providing the services and skills necessary to litigate a difficult case properly."

On appeal, Windmill contends that the trial court abused its discretion in determining that $265,688.50 was a reasonable attorney fee. Windmill argues that, although the trial court acted properly by considering the factors listed in ORS 20.075(2), it did not adequately consider two of those factors: (1) "[t]he fee customarily charged in the locality for similar legal services," ORS 20.075(2)(c), and (2) "[t]he amount involved in the controversy and the results obtained," ORS 20.075(2)(d). We find no abuse of discretion. *See Cascade Corp. v. American Home Assurance Co.*, 206 Or App 1, 14, 135 P3d 450 (2006), *rev dismissed*, 342 Or 645 (2007) (identifying standard of review).

As to the first of the two factors, Windmill contends that the trial court failed to account for the fact that the "locality" that should have been used in considering what is "customarily charged" is southern Oregon, not Portland, where Hanna's attorneys have their offices. The rates that Hanna's attorneys charged ($185 to $295 per hour) exceeded the southern Oregon average, as determined by the Oregon State Bar's economic survey of attorney fees, by $64 to $129 per hour. According to Windmill, the trial court failed to note that discrepancy and to accord it any weight. Windmill does not assert that Hanna could not choose to use Portland attorneys and pay them Portland rates, only that "Windmill cannot be saddled with the cost of that choice."

The trial court's findings, however, make clear that the court considered that argument but was convinced from its own observations and expert testimony that the case was difficult, requiring specialized business litigators not readily available in the locality. Indeed, Hanna's expert testified that he did not think that a small firm could handle a case of this size, that it would be "economic suicide" for it to attempt to do so, and that he was not aware of counsel in Douglas County who could take on a case of this size. Further, the trial court noted that the experts retained by both parties to address the fee issue were from outside the county. Although the trial court's findings do not address the local region beyond Douglas County, we nevertheless find that the complexity of

the case and the expert testimony on which the court relied provided a sufficient basis for the trial court's decision.

Next, Windmill contends that the trial court inflated the value of the amount in controversy, which, it asserts, is speculative and is, at most, $40,000 a year and "most likely" around $20,000 a year. Windmill argues that, given the acrimony between the parties and Hanna's threat to terminate the lease, it is questionable whether the options on the two remaining terms will be exercised at all. Even if those terms are included, Windmill asserts, the total recovery, not reduced to present value, would be about $300,000. Windmill contends that the trial court abused its discretion through a "failure to recognize or deal with the contingent nature of the Lease, and its failure even to attempt quantification of the amount at stake."

Hanna responds that the total amount of attorney fees incurred was due, in part, to Windmill's litigation tactics. As a result of those tactics, Hanna argues, the costs of ligation greatly increased. Windmill counters that it does not contest the total number of hours spent by Hanna's attorneys, only the total amount awarded. Nevertheless, the trial court acted within its discretion in awarding the fees it did, in light of the amount in controversy and the result obtained. The court did not "inflate" the dollar value of the controversy or err by basing that amount on speculation. Indeed, the court made no attempt to put a dollar value on the litigation. Rather, it addressed the importance to the parties of establishing the method for calculating rent, both for the present term and potential future terms and for the future valuation of the property; the parties' business relationship; Windmill's counterclaim against Hanna, which was dismissed; and their requests for fees. Although the court made no attempt to value the litigation, the dollar value of current and future rent is somewhere between $100,000—in Windmill's view—and $600,000—what Hanna views as a "conservative" amount, based on a rent difference of $40,000 per year over a 15-year period.

Given those factors, including the fact that Windmill does not contest the number of hours spent by Hanna's attorneys on this litigation, and our conclusion that the trial court

did not abuse its discretion in finding Hanna's attorneys' rates reasonable, we conclude that the trial court did not abuse its discretion in setting the attorney fee award.

Affirmed.