Argued and submitted June 3, 2009, reversed in part and remanded April 28,
petition for review denied October 21, 2010 (349 Or 173)

CERTAIN UNDERWRITERS AT LLOYD'S LONDON
AND EXCESS INSURANCE COMPANY, LIMITED,
*Plaintiffs-Appellants,*

*v.*

MASSACHUSETTS BONDING AND
INSURANCE COMPANY,
succeeded in interest by Hanover Insurance Company;
Maine Bonding and Casualty Company,
a Maine corporation,
dba Maryland Casualty Company,
dba Zurich Insurance Company;
RLI Insurance Company, an Illinois corporation;
The Home Indemnity Company, succeeded in interest by
The Home Insurance Company,
a New Hampshire corporation;
Highlands Insurance Company, a Texas corporation,
dba Cigna Property and Casualty Insurance Company,
aka Cigna Insurance Company of North America,
a Pennsylvania corporation, succeeded in interest by
CCI Insurance Company, succeeded in interest by
Century Indemnity Company,
dba Cigna Specialty Insurance Company, aka Cigna;
Century Indemnity Company, a Pennsylvania corporation,
dba Cigna Property and Casualty Insurance Company,
aka Cigna, individually and as successor in interest to
CCI Insurance Company, the successor in interest to
Insurance Company of North America,
*Defendants,*

*and*

BENEFICIAL FIRE AND CASUALTY
INSURANCE COMPANY,
succeeded in interest by
JC Penney Life Insurance Company,
then succeeded in interest by
Stonebridge Life Insurance Company,
a Vermont corporation;
Continental Insurance Company,
a New Hampshire corporation,
dba CNA Insurance Companies and
as successor in interest to

Glens Falls Insurance Company,
a Delaware corporation,
dba CNA Insurance Companies;
National Union Fire Insurance Company
of Pittsburgh, PA, a Pennsylvania corporation;
and Industrial Indemnity Company,
succeeded in interest by
United States Fire Insurance Company,
a New York corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
030403995; A129974

230 P3d 103

101-a

John Folawn argued the cause for appellants. With him on the briefs was Kirklin Folawn LLP.

Thomas W. Brown argued the cause for respondents. On the joint and supplemental briefs were Thomas W. Brown and Cosgrave Vergeer Kester LLP; Thomas Gordon, Diane L. Polscer, Russell W. Pike, and Gordon & Polscer L.L.C.; Jeffrey M. Kilmer and Kilmer, Voorhees & Laurick, P.C.; Richard A. Lee, Charles Albertson, Carl Forsberg, and Bodyfelt Mount Stroup & Chamberlain, LLP & Forsberg Umlauf; Peter J. Mintzer, Thomas M. Jones, Michael D. Handler, and Cozen O'Connor.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Brewer, C. J., *vice* Edmonds, P. J.

**SERCOMBE, J.**

Plaintiffs and defendants issued various insurance policies to a common insured, Zidell,[1] which operated a scrapping business along the Willamette River. Zidell later became the target of an environmental cleanup action and eventually filed claims against its insurers, including plaintiffs and defendants, seeking a declaration of coverage related to the cleanup action, as well as reimbursement for defense and indemnity costs already incurred. Defendants settled with Zidell and were dismissed from the case. Plaintiffs, meanwhile, proceeded to trial, and the court entered a judgment in Zidell's favor.

Following the entry of that adverse judgment, plaintiffs filed this contribution action against defendants, the settling insurers. Plaintiffs alleged that the duty to defend Zidell from an environmental cleanup action was an obligation owed by plaintiffs and defendants jointly. Having paid a disproportionate share of that common obligation, plaintiffs alleged, they were entitled to pro rata contributions from defendants. Defendants moved for summary judgment on a number of grounds, including (1) that the allocation of defense costs had already been litigated in the underlying coverage action, and (2) that defendants' settlements with Zidell extinguished any common liability for purposes of a contribution claim. The trial court granted defendants' motions, and plaintiffs appeal. We reverse in part and remand.

## I. BACKGROUND

The relevant facts are procedural and largely undisputed. From the 1950s through the early 1980s, plaintiffs and defendants insured Zidell under various insurance policies. In 1994, Zidell became the subject of a Department of Environmental Quality (DEQ) cleanup action based on environmental contamination on its property at Moody Avenue. After receiving a demand letter from DEQ in May 1994, Zidell sought coverage under its various insurance policies,

---

[1] More accurately, the parties insured a number of related entities, including ZRZ Realty Co. and others. For ease of reference, we refer to those entities collectively as Zidell.

on the theory that the pollution occurred and persisted during the relevant policy periods. In August 1997, after its insurers denied coverage, Zidell commenced an action against plaintiffs and defendants, as well as other insurers, alleging that the insurers had "refused or otherwise failed to provide Zidell with a defense of the DEQ action, to pay defense, investigation and loss mitigation costs and/or to pay Zidell for all liabilities and damages Zidell ha[d] been legally obligated to incur * * *." For purposes of this opinion, we refer to that underlying coverage action as the *"Moody Avenue"* action.

During the course of the *Moody Avenue* action, several insurers settled out. Defendants Beneficial Fire, National Union, and Industrial Indemnity Company (U.S. Fire) were among those who settled first, which left defendants Glens Falls and Continental Insurance Company (collectively CNA), defendant Century Indemnity Company (CIGNA), and plaintiffs as the only remaining insurers in the coverage case.

In October 1999, the *Moody Avenue* court ruled on a series of summary judgment motions filed by Zidell and the remaining insurers. The court ruled that "the duty to defend is a joint and several obligation, which will be allocated among the Defendant Insurers. Allocation should not be any hindrance to the duty to defend." The court further ordered that "the Defendant Insurers"—at that time, CNA, CIGNA, and plaintiffs—were to "make payment of past defense costs submitted by [Zidell] to date" and that, "with respect to ongoing defense costs," the parties were to put in place a "reasonable system for submission, review and payment of these costs."

The remaining insurers paid Zidell's accrued defense costs—approximately $771,000—as ordered. Of that amount, plaintiffs paid approximately $578,000, and CNA and CIGNA paid the rest. The payments were made by plaintiffs with the understanding that they were "subject to a full reservation of each insurer's rights."

After the start of trial in the *Moody Avenue* action, CNA settled out. The settlement then left plaintiffs and CIGNA as the only insurers subject to the court's order to pay

Zidell's remaining defense costs. Together, plaintiffs and CIGNA paid another $619,982 in defense costs, with plaintiffs again paying the lion's share—approximately $566,000. Then, after trial but while the court was still preparing its findings of fact and conclusions of law, CIGNA settled with Zidell. Plaintiffs were the last insurers standing.

In April 2003, the trial court entered judgment against plaintiffs. With respect to the issue of defense costs, the judgment provided, in part, that plaintiffs were "jointly and severally obligated to pay Zidell's costs of defense, that is, attorney fees, costs and disbursements, and investigative costs, incurred in connection with claims asserted" in the DEQ action. The judgment also contained the following paragraph:

> "19. [Plaintiffs], together with dismissed defendants CNA and CIGNA (who shared the joint and several obligation to pay Zidell's defense costs prior to their dismissal from this case), have satisfied their obligation for defense costs of $1,390,658.65 incurred by Zidell through August 31, 2001, with respect to the DEQ Action and the prejudgment interest of $37,768.35 thereon. [Plaintiffs] are now responsible only for defense costs submitted by Zidell subsequent to August 31, 2001."

As far as plaintiffs' indemnity obligations (*i.e.*, the costs of remediation as a result of the DEQ claims rather than defending against them or investigating them), the *Moody Avenue* judgment incorporated the trial court's earlier findings of fact and conclusions of law, which allocated indemnity costs to particular policies. The trial court also awarded Zidell its attorney fees as the prevailing party in the coverage action, pursuant to ORS 742.061—an additional $1,379,119.

Immediately after the April 2003 judgment was entered, plaintiffs filed this contribution action. In their complaint, plaintiffs alleged:

> "On and after July 26, 1994, [when Zidell notified plaintiffs and defendants of the DEQ action,] Zidell incurred reasonable and necessary defense costs in defending the DEQ claim. None of Zidell's defense costs were paid until on or about August 1999, when plaintiffs paid $578,007.35, the

CIGNA defendants paid $77,067.64 and the CNA defendants paid $115,601.47. Since that time, plaintiffs have paid $1,157,317.10 for additional defense costs incurred by Zidell in defending the DEQ claim. Except for payments made by the CIGNA and CNA defendants as stated herein, no other payments of Zidell's defense costs have been made by any defendant."

Plaintiffs similarly alleged that they had been held liable for attorney fees pursuant to ORS 742.061, as well as prejudgment interest on the unpaid defense costs, for which defendants would have been liable had they not settled with Zidell before the *Moody Avenue* judgment was entered. The complaint summarized the contribution theory in this way:

"Plaintiffs have paid or incurred liabilities to Zidell for defense costs, prejudgment interest and statutory attorney fees and costs, which liabilities are disproportionate to the insurance coverage provided by them when compared to the insurance coverage provided by defendants. Plaintiffs will continue to pay Zidell defense costs until the DEQ claim is resolved. Plaintiffs are entitled to contribution from defendants and each of them for a proportionate share of Zidell's defense costs, prejudgment interest and statutory attorney fees and costs as follows:

"a. To the extent the respective insurance policies contain 'other insurance' clauses which are mutually repugnant, on the basis of policy limits.

"b. To the extent the respective insurance contracts do not contain mutually repugnant 'other insurance' clauses, on the basis of the number of insurance policies at issue."

Plaintiffs also alleged an entitlement to attorney fees pursuant to ORS 742.061, in the event that they prevailed on their contribution claims.

The parties then filed a slew of summary judgment motions. Defendants (all of them) moved for summary judgment on two grounds: first, that plaintiffs' claims were barred by issue preclusion because the *Moody Avenue* action already decided the parties' obligations for defense costs; and second, that any contribution claims were extinguished by defendants' settlements with Zidell. Defendants (again, all of them) alternatively moved for partial summary judgment on

other issues, namely (1) whether plaintiffs could obtain contribution for attorney fees that were awarded to Zidell under ORS 742.061; and (2) whether plaintiffs themselves could seek statutory attorney fees under ORS 742.061 as part of a contribution action against other insurers.

Certain defendants also filed alternative summary judgment motions in which others did not join. Defendants Beneficial and U.S. Fire moved for summary judgment on the ground that they never had any duty to defend Zidell to begin with, because the notice of the DEQ action was insufficient to trigger such a duty. Defendant National Union moved for summary judgment on the ground that plaintiffs' contribution claims were barred by amendments to Oregon's Environmental Cleanup Assistance Act, which retroactively addressed the issue of inter-insurer contribution. Under those amendments, according to National Union, an insurer who had settled with its insured was not "liable or potentially liable" to the insured and therefore not subject to contribution claims.

Plaintiffs, meanwhile, filed their own summary judgment motions. They sought partial summary judgment on two issues: (1) that defendants, like plaintiffs, had a duty to defend Zidell under their policies; and (2) that any contribution would be determined on a pro rata basis, according to the *Lamb-Weston* rule. *See Lamb-Weston et al v. Ore. Auto. Ins. Co.*, 219 Or 110, 119, 341 P2d 110, *reh'g den*, 219 Or 130, 137, 341 P2d 110 (1959).

At a hearing on the various motions, the trial court explained that it was "in agreement with every point made by every defendant in all of defendants' papers," with the exception of National Union's argument regarding the effect of amendments to Oregon's Environmental Cleanup Assistance Act. The court then entered an order consistent with its preliminary view, which denied plaintiffs' motions and granted all of defendants' motions, except National Union's separate, alternative motion. The order was reduced to a judgment dismissing plaintiffs' claims; plaintiffs appealed that judgment, which is the case before us now.

Before turning to the merits of this appeal, we note that, while plaintiffs were litigating their contribution claims, they had also appealed the underlying *Moody Avenue*

judgment. In that appeal, plaintiffs argued, among other things, that the trial court had incorrectly allocated the burden to plaintiffs to prove that Zidell's pollution was neither "unexpected nor unintended." We agreed with plaintiffs on that issue and ultimately reversed and remanded the case; as a result, we also vacated the statutory attorney fee award against plaintiffs. *ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 222 Or App 453, 194 P3d 167 (2008), *modified on recons*, 225 Or App 257, 201 P3d 912, *rev allowed*, 346 Or 363 (2009). That decision affects—and moots—certain but not all issues in this case. Rather than further complicate the case at this juncture, we will discuss the effect of that decision with respect to particular assignments of error.

## II. ANALYSIS

### A. *Plaintiffs' Assignments of Error*

#### 1. *Issue preclusion*

In their motions for summary judgment, defendants contended that the trial court's rulings in the *Moody Avenue* action conclusively adjudicated defendants' liability for defense costs. Thus, according to defendants, under the doctrine of issue preclusion, plaintiffs were barred from relitigating that issue in a separate contribution action. The trial court expressed its "agreement with every point made by every defendant in all of defendants' papers," presumably including defendants' issue preclusion argument. Plaintiffs, in their first assignment of error, contend that the trial court erred in granting summary judgment on that ground.

In a supplemental brief filed after this court decided *ZRZ Realty*, defendants contend that plaintiffs' first assignment of error no longer presents a live controversy because, as a result of our decision in *ZRZ Realty*, plaintiffs no longer have an adverse judgment against them in the underlying coverage action. Plaintiffs, in response, submit that their contribution claims are not predicated on the existence of an adverse judgment in the *Moody Avenue* action; rather, they arise out of the fact that plaintiffs satisfied a debt—payment of defense costs—that should also have been borne by defendants.

We are not persuaded that plaintiffs' first assignment of error is moot. There is no dispute that plaintiffs have,

in fact, paid Zidell's past defense costs, and our decision in *ZRZ Realty* does not change that fact or otherwise address plaintiffs' liability for previously paid defense costs; that was not an issue on appeal in *ZRZ Realty*. Accordingly, we turn to the merits of the parties' arguments regarding plaintiffs' first assignment of error.[2]

■   In general, under the doctrine of issue preclusion, a party is barred from relitigating an issue of law or fact that was adjudicated in a prior proceeding. *See generally Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103-04, 862 P2d 1293 (1993) (setting out the requirements for issue preclusion). According to defendants, their liability for Zidell's defense costs—the subject of plaintiffs' contribution claims—was actually litigated in the *Moody Avenue* action. Specifically, defendants rely on a number of statements made by the trial court during the course of the *Moody Avenue* action regarding defense costs, statements that defendants contend were then incorporated in the trial court's written judgment. Plaintiffs respond that the excerpts are taken out of context and that the trial court never intended to decide how defense costs should be allocated among Zidell's various insurers.

■   The statements relied on by defendants were made by the court during attorney fee hearings in October 2002—hearings at which the court stated an intent to resolve the "whole allocation between non-attorney fee and attorney fee issues and between other carriers and this carrier, et cetera." During the course of the hearings, the court made certain

---

[2] Although the appeal in the *Moody Avenue* case does not "moot" this assignment of error, the pendency of the appeal does not strike us as entirely irrelevant to the merits of the assignment. For issue preclusion to apply, the issue must have been essential to a *final* decision on the merits in the prior proceeding. *See Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103-04, 862 P2d 1293 (1993) (setting out the requirements for issue preclusion). The mere fact that the *Moody Avenue* judgment was on appeal—and later reversed—causes us to question whether defendants can demonstrate the existence of a "final" decision for purposes of issue preclusion. *Cf. Drews v. EBI Companies*, 310 Or 134, 149, 795 P2d 531 (1990) (for purposes of issue preclusion, "[a] claim determination is not final until hearing and judicial review rights are barred or exhausted"); *see also Liberty Northwest Ins. Corp. v. Koitzsch*, 155 Or App 494, 500, 964 P2d 1071 (1998) ("As a general proposition, as long as an appeal is pending, finality does not attach piecemeal to the parts of a judgment or order that are not placed in direct controversy by the parties' assignments or arguments in the appeal; it attaches to the case as a whole after the appellate process is complete."). Plaintiffs, however, do not make that argument, and we do not address it further.

statements that reflected its understanding that the settling defendants had extinguished their duties to defend as of the date of settlement; the court also signaled its intent to reduce plaintiffs' attorney fee liability after taking into account the settlements. However, even assuming that the court's statements at the attorney fee hearings have some bearing on the issues in this contribution case, there is nothing in the record to suggest that the court intended those statements to be elevated to the status of findings or rulings that would be incorporated in the judgment. In fact, plaintiffs and Zidell ultimately stipulated to an amount of attorney fees, thereby resolving the issues discussed during the October hearings. Neither the stipulation nor the *Moody Avenue* court's award of attorney fees based on that stipulation makes any mention of defense costs or allocation.

Given the fact that the court never actually made a ruling on the allocation issues raised in October 2002, defendants' reliance on the court's statements during those hearings is unavailing. Issue preclusion requires that "[t]he issue was actually litigated and was essential to a final decision on the merits in the prior proceeding." *Nelson*, 318 Or at 104. On the record before us, defendants have not demonstrated that the issues raised by plaintiffs' contribution claims were actually decided by the *Moody Avenue* court in October 2002, and the trial court's grant of summary judgment cannot be upheld on that basis.

Alternatively, defendants contend that plaintiffs' contribution claims were necessarily extinguished by paragraph 19 of the *Moody Avenue* judgment, set out above. *See* 235 Or App at 104. That paragraph, once again, states that plaintiffs,

> "together with dismissed defendants CNA and CIGNA (who shared the joint and several obligation to pay Zidell's defense costs prior to their dismissal from this case), *have satisfied their obligation for defense costs* of $1,390,658.65 incurred by Zidell through August 31, 2001 * * *. [Plaintiffs] are now responsible only for defense costs submitted by Zidell subsequent to August 31, 2001."

(Emphasis added.) According to defendants, the use of the past tense is significant: Any "shared" obligation owed to

Zidell was "satisfied," and any contribution claim thereby extinguished, when defendants settled out of the case.

Defendants read too much into the judgment. Paragraph 19 addresses claims between Zidell and its insurers (plaintiffs, CNA, and CIGNA). And, as between Zidell and its insurers, the judgment states that any defense obligation for costs incurred through August 31, 2001, had been satisfied. That is, the judgment states that the "shared" obligation was discharged by its insurers *collectively*; the judgment does not parse out the obligation of individual insurers or purport to resolve the issue in this case—*i.e.*, whether plaintiffs paid a disproportionate amount in satisfying that "shared" obligation.

In sum, the trial court erred in ruling that plaintiffs' claims were barred by the doctrine of issue preclusion.

### 2. *Effect of settlement agreements*

In their second assignment, plaintiffs argue that the trial court erred in concluding that defendants' settlements with Zidell foreclosed any subsequent contribution claims as a matter of law. Again, preliminarily, defendants contend that this assignment of error is moot in light of our decision in *ZRZ Realty*. For the same reasons discussed regarding plaintiffs' first assignment of error, we disagree with that contention and turn instead to the merits of the parties' arguments.

In addition to their issue preclusion arguments, defendants moved for summary judgment on the ground that, once Zidell released them from any and all liability under settlement agreements, defendants were no longer subject to a contribution claim. They reason as follows: The duty to defend is a contractual obligation between an insurer and its insured, *Northwest Pump v. American States Ins. Co.*, 144 Or App 222, 226, 925 P2d 1241 (1996), which can be extinguished by a settlement agreement. Once the duty to defend is extinguished by settlement, the insurer no longer has any obligation or debt to the insured. Hence, the settling insurer no longer has a "common debt" or "joint obligation" with nonsettling insurers and cannot be liable for contribution.

Plaintiffs, meanwhile, argue that their right to equitable contribution from defendants arose before defendants settled with Zidell and exists independently of any rights that Zidell might have surrendered in those settlements. In other words, plaintiffs contend that the right to contribution was *theirs* and could not be surrendered by Zidell.[3]

So framed, the parties' dispute reduces to whether plaintiffs' right to contribution exists independently of the rights of Zidell, the insured. Although that particular question appears to be one of first impression in this state, we are not without guidance on the subject. On a number of occasions, our Supreme Court has explored the nature and origin of equitable contribution among insurers, shedding some light on the issue before us. *See generally Farmers Ins. Co. v. St. Paul Fire and Marine Ins.*, 305 Or 488, 491-92, 752 P2d 1212 (1988) (describing Supreme Court's past treatment of equitable contribution claims).

In *Lamb-Weston,* the court considered the relative financial responsibility of insurers who were liable for the same occurrence under their respective policies. One insurer (along with its insured) settled a claim against the insured, and then sought payment from another insurer. The policies at issue, however, each contained "other insurance" clauses that required the insured to first exhaust the limits of other insurance before collecting on the policy. The court explained that,

"in such a situation, the court is faced with determining which company shall be considered primarily liable, or treating the 'other insurance' clause in each insurer's policy as so repugnant that they must both be ignored, *and apply*

---

[3] Defendants argue that plaintiffs failed to preserve the argument that the right to equitable contribution is independent of the insured's rights and cannot be extinguished by the insured's settlements with other insurers. We disagree. Although plaintiffs did not focus on that issue during oral argument in the trial court, or brief it as cogently below as they do on appeal, plaintiffs' brief in opposition to summary judgment did argue that an agreement between the settling insurer and the insured "cannot unilaterally change the other insurers' rights to contribution"—the argument they now assert. Plaintiffs further argued that the settlements were never intended to extinguish contribution rights, an argument they reprise on appeal. Given our conclusion that the settlements could not extinguish plaintiffs' independent rights to contribution, we need not reach plaintiffs' alternative contention regarding the scope of the settlements.

*the rule that the loss shall be equally prorated between them.*"

219 Or at 119 (emphasis added). In the process of endorsing the latter approach, the court quoted extensively from *Amer. Auto. Ins. Co. v. Seaboard Surety Co.*, 155 Cal App 2d 192, 318 P2d 84 (1957), regarding the nature of the insurers' reciprocal rights:

> " '[T]heir agreements are not with each other. * * * Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders. The Minnesota Supreme Court, dealing with policies covering two insured persons whose liability for an accident was primary and secondary between themselves, said in *Commercial Casualty Ins. Co. v. Hartford Accident & Indemnity Co.*, 190 Minn 528, 252 NW 434, 435, 253 NW 888 [(1934)]: *The two contracts of insurance and their interpretation must be the factual basis of decision. But there was no contract and so no contractual relation between the insurers. Neither was beneficiary of the other's contract. Neither having any contract right against the other, but both being under contractual obligations in respect to the same risk, it remains only to determine the respective equities. If they are concurrently liable for the same risk, it is but obvious equity that there should be contribution." ' "

219 Or at 124-25 (emphasis added).

In denying the defendant insurer's petition for rehearing in *Lamb-Weston*, the court further explored the source of pro rata contribution among insurers, tracing those principles from admiralty and the settlement of marine insurance claims in merchant courts to equitable maxims concerning joint insurers of a single risk. *Id.* at 132-37; *see also Farmers Ins. Co.*, 305 Or at 491 (so describing *Lamb-Weston*). Based on those settled principles, the court concluded that the loss as between insurers should be "prorated in the ratio which the limits of the policies bear to the total coverage." *Lamb-Weston*, 219 Or at 137.

Later, in *Carolina Casualty v. Oregon Auto.*, 242 Or 407, 417, 408 P2d 198 (1965), the court further clarified the

nature of equitable contribution among insurers. The court distinguished the doctrine of equitable contribution from contract-based subrogation rights:

> "An insurer's rights against its co-insurer for contribution arise[ ] out of the equitable doctrine which holds that one who pays money for the benefit of another is entitled to be reimburse[d]. *Van Winkle v. Johnson,* 11 Or 469, 471, 5 P 922, 50 Am Rep 495 (1884);[4] *American Auto. Ins. Co. v. Seaboard Sur. Co.,* 155 Cal App 2d 192, 196, 318 P2d 84 (1957); *Lamb-Weston [et al] v. Oregon Auto. Ins. Co.,* 219 Or 110, 133-135, 341 P2d 110, 346 P2d 643, 76 ALR2d 485 (1959); 6 Appleman, *Insurance Law and Practice,* § 3902 (1942). Such rights do not arise by way of subrogation."

242 Or at 417.

In light of the foregoing case law, it is apparent that the right to equitable contribution among insurers is not based on a subrogation or contract theory, whereby an insurer stands in the shoes of its insured. Rather, the right is grounded in principles of equity and is a right that inures to the benefit of the insurer—in this case, plaintiffs—and not the insured, Zidell.

For that reason, we conclude that defendants' settlements with Zidell did not operate to extinguish plaintiffs' right to equitable contribution for defense costs paid prior to the settlement. If plaintiffs and defendants had the same obligation to defend Zidell,[5] and plaintiffs discharged a disproportionate share of that obligation, then their right to equitable contribution arose at that point in time. Although Zidell was able to release its own claims against defendants for defense costs, Zidell was not in a position to release *plaintiffs' claims* against defendants.

Other courts have reached that same conclusion when considering equitable contribution among insurers. For example, in *Fireman's Fund Ins. Co. v. Maryland Cas. Co.,* 65

---

[4] In *Van Winkle,* a case involving sureties on a promissory note, the court stated, "The right to it did not depend upon contract, but sprung from equitable considerations arising out of the relation of the parties to each other, and the fact of a common interest and a common burden to bear." 11 Or at 471.

[5] For purposes of this opinion, we assume that the duty to defend was, in fact, a shared obligation; the parties do not argue otherwise.

Cal App 4th 1279, 1294, 77 Cal Rptr 2d 296 (1998), the court explained that the right of "equitable contribution belongs to each insurer individually. It is not based on any right of subrogation to the rights of the insured, and is not equivalent to 'standing in the shoes' of the insured." (Internal citation omitted.) In distinguishing equitable contribution from subrogation (as the Oregon Supreme Court has done), the court explained:

> "Unlike subrogation, the right to equitable contribution exists *independently* of the rights of the insured. It is predicated on the common sense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor."

*Id.* at 1295 (emphasis in original). Accordingly, the court held that "one insurer's settlement with the insured is not a bar to a separate action against that insurer by the other insurer or insurers for equitable contribution or indemnity." *Id.* at 1289;[6] *accord Rhone-Poulenc Inc. v. International Ins. Co.*, 71 F3d 1299, 1305, 12 (7th Cir 1995) ("The right [to equitable contribution] is not the insured's to disclaim. It is a right of other insurers, who are not parties to the insurance policy, and it is a right founded not on the concept of third-party beneficiaries of contracts and hence not on the wishes of the insured but rather on notions of equity and unjust enrichment." (Internal quotation marks omitted.)).

Defendants do not direct us to any cases from Oregon or other jurisdictions in which an insured's release has been held to extinguish a nonsettling insurer's right to equitable contribution.[7] Rather, they rely on a footnote in this

---

[6] The court revisited the same issue in *Employers Ins. Co. of Wausau v. Travelers Indemnity Co.*, 141 Cal App 4th 398, 405, 46 Cal Rptr 3d 1 (2006), again holding that an insurer's equitable contribution rights are independent of the insured's rights and survive an insured's release of another insurer.

[7] In their response brief, defendants suggest that *Fireman's Fund Ins. Co. v. Ed Niemi Oil Co., Inc.*, 436 F Supp 2d 1174, 1177 (D Or 2006), supports their position. That case involved the application of a statute to cut off the plaintiffs' right to contribution—an issue discussed later in this opinion with respect to defendant

court's opinion in *Cascade Corp. v. American Home Assurance Co.*, 206 Or App 1, 10 n 6, 135 P3d 450 (2006), *rev dismissed*, 342 Or 645 (2007), as well as the public policy favoring settlements. Neither argument is persuasive.

In a footnote in *Cascade Corp.*, we stated that "[t]he [*Lamb-Weston*] proration, of course, was between insurers who had not settled with the insured and who thus remained potentially liable for the loss to the extent of their policy limits." 206 Or App at 10 n 6. Defendants contend that, in the words of *Cascade Corp.*, defendants *have* settled and are no longer "potentially liable"; thus, the *Lamb-Weston* rule does not apply. Simply put, our footnote in *Cascade Corp.* says nothing about the issue before us. The footnote immediately followed a quote from a later case, *Smith v. Pacific Auto. Ins. Co.*, 240 Or 167, 173, 400 P2d 512 (1965), in which the Supreme Court stated that, "[u]nder the *Lamb-Weston* formula, the various carriers must prorate their share of the loss, not their share of one carrier's limits." Read in context, we cited *Smith* for the proposition that the *Lamb-Weston* allocation does not excuse insurers from complying with their obligations toward their insured. The footnote merely noted that, in *Smith*, neither insurer had ever discharged its obligation to the common insured; it cannot be read for more than that.

As for the public policy argument, defendants do not explain why a public policy favoring settlement should trump the equitable considerations that underpin the right to contribution among insurers. In rejecting a public policy argument similar to the one advanced by defendants, the California Court of Appeals explained:

"Defendants contend that applying *Fireman's Fund* here will contravene public policy by discouraging insurers from settling with their insureds. But balanced against the societal interest in encouraging settlements are other public policy interests and the equitable concerns underlying the well-established rule of contribution between insurers. * * * Defendants provide no authority for their *ipse dixit*

National Union's cross-assignment of error. In any event, the district court's decision has since been reversed by the Ninth Circuit in an unpublished disposition. 317 Fed Appx 623 (9th Cir 2008).

claim that policies favoring the encouragement of settle-
ments militate a rule that would permit a coinsurer to
evade its share of the defense burden by separately settling
with its insured. Nor is there evidence before us that the
*Fireman's Fund* rule in fact discourages settlement. Here,
defendants settled with their insurer and anticipated the
possibility they could be held liable for contribution. They
included in the settlement agreements provisions that
require [the insured] to indemnify them for such claims.
* * * We are not persuaded to create an exception to the rule
in this case."

*Employers Ins. Co. of Wausau v. Travelers Indemnity Co.*, 141
Cal App 4th 398, 406, 46 Cal Rptr 3d 1 (2006). We, similarly,
are not persuaded that a public policy favoring settlements
merits a departure from the common-law rule governing
equitable contribution.

For all of those reasons, we conclude that the trial
court erred in granting summary judgment on the ground
that plaintiffs' contribution claims were extinguished by
defendants' settlements with Zidell.[8]

3. *Cost-sharing agreements*

In their third assignment of error, plaintiffs contend
that the trial court erred in ruling that certain language in a
cost-sharing agreement between plaintiffs and CIGNA pre-
cluded a later contribution action. Plaintiffs have since set-
tled with CIGNA, and this issue is now moot.

4. *Contribution for statutory attorney fees*

In their fourth assignment, plaintiffs contend that
the trial court erred in ruling that plaintiffs are not entitled
to contribution for attorney fees awarded to Zidell as the pre-
vailing party in the coverage action. In *ZRZ Realty*, we

---

[8] We emphasize the narrow scope of our holding in that regard. The question
raised by defendants' summary judgment motions is whether their settlement
agreements extinguished plaintiffs' contribution claims. Plaintiffs' claims seek
contribution for defense costs that plaintiffs paid and that Zidell incurred begin-
ning in July 1994. For purposes of resolving the issues raised on summary judg-
ment, we assume that plaintiffs' claims seek contribution for defense costs that
Zidell incurred before the settlements. We express no opinion regarding the effect,
if any, that the settlement agreements had with respect to contribution liability for
defense costs that Zidell incurred *after* the date of the settlements.

vacated the underlying award of attorney fees that is the basis for this assignment of error. 222 Or App at 495. Accordingly, we do not reach plaintiffs' fourth assignment.

5. *Plaintiffs' claim for attorney fees incurred in this action*

In their complaint, plaintiffs alleged a right to any attorney fees incurred as part of this contribution action. According to plaintiffs, the contribution action is an action "upon [a] policy of insurance," and, thus, if plaintiffs are to prevail, they would be entitled to their attorney fees pursuant to ORS 742.061(1). Defendants moved for partial summary judgment on that issue, arguing that an equitable contribution action is not the type of action that gives rise to an attorney fee entitlement under the statute. The trial court granted defendants' motion, and plaintiffs' fifth assignment of error is directed at that ruling.

The question raised in this assignment involves a question of statutory construction—namely, whether an equitable contribution action fits within the scope of ORS 742.061(1). That statute provides, in part:

"Except as otherwise provided in subsections (2) and (3) of this section, if settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

Based on the plain text of the statute, it is readily apparent that an equitable contribution action is not the type of action for which the legislature intended to extend a right to attorney fees. First of all, the triggering events in ORS 742.061(1) pertain to the relationship between an insured and its insurer. One of the predicates to an award of attorney fees under the statute—that settlement is not made "within six months from the date proof of loss is filed with an insurer"—plainly refers to an insured's proof of loss under an insurance policy. *See Dockins v. State Farm Ins. Co.*, 329 Or 20, 28, 985 P2d 796 (1999) (explaining that the purpose of the

proof of loss is "to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay" (internal quotation marks omitted)).

■      Second, plaintiffs acknowledge that their equitable contribution claims are distinct from a subrogation claim or an assignment—that is, they are not standing in the shoes of the insured or enforcing the insured's contractual rights. Rather, they are enforcing their own equitable right to contribution that exists independently of the insured's rights. *Cf. Fick v. Dairyland Insurance*, 42 Or App 777, 781, 601 P2d 868 (1979) (insurance company enforcing rights of insured by way of assignment entitled to statutory attorney fees; "there is nothing compelling in the words of the statute itself that limits recovery of attorney fees to the insured or injured party or that excludes insurance companies from being entitled to the benefit of the public policy"). The public policy considerations driving ORS 742.061—encouragement of settlement of insurance claims and reimbursement of insureds who are forced to litigate to recover on their policies[9]—are simply different from those at play in interinsurer disputes about equitable contribution, and nothing in the statutory text or context suggests that the legislature intended ORS 742.061 to apply to those types of disputes.[10] The trial court did not err in granting defendants' motion for partial summary judgment regarding plaintiffs' entitlement to attorney fees under ORS 742.061.

### 6.  *Duty to defend under Zidell's policies with Beneficial and U.S. Fire*

■      Plaintiffs' sixth assignment of error concerns the trial court's rulings on cross-motions for summary judgment by plaintiffs and defendants Beneficial and U.S. Fire on the

---

[9] *See Chalmers v. Oregon Auto. Ins. Co.*, 263 Or 449, 452, 502 P2d 1378 (1972) (ORS 742.061(1) was intended "to encourage the settlement of [insurance] claims without litigation and to reimburse successful plaintiffs reasonably for moneys expended for attorney fees in suits to enforce insurance contracts").

[10] Nor have plaintiffs offered any legislative history that suggests that the legislature intended ORS 742.061 to apply in the context of equitable contribution claims among insurers.

question whether those defendants had a duty to defend Zidell.[11] Plaintiffs moved for partial summary judgment on the question whether DEQ's demand letter to Zidell in May 1994, which was then forwarded to defendants, triggered the duty to defend in each of the relevant policies. Beneficial and U.S. Fire opposed that motion and filed their own motions for summary judgment on the same issue, arguing that the DEQ letter was not a "complaint" that triggered their duty to defend a "suit" against Zidell. The trial court granted summary judgment in favor of Beneficial and U.S. Fire and against plaintiffs.

Plaintiffs' sixth assignment of error requires us to determine whether the documents that Zidell provided to its insurers—the May 1994 DEQ letter and accompanying documents—were sufficient to trigger the duty to defend Zidell under Beneficial's and U.S. Fire's policies.[12] As we explained in *Schnitzer Investment Corp. v. Certain Underwriters*, 197 Or App 147, 155, 104 P3d 1162 (2005), *aff'd*, 341 Or 128, 137 P3d 1282 (2006):

"The basic rules pertaining to an insurer's duty to defend are well established:

" 'Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy. * * * An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy. * * *

" 'In evaluating whether an insurer has a duty to defend, the court looks only at the facts alleged in the complaint to determine whether they provide a basis for

---

[11] Although plaintiffs moved for partial summary judgment against the other defendants on the same grounds, those defendants did not file cross-motions for summary judgment. Thus, only the denial of plaintiffs' motion for partial summary judgment against Beneficial and U.S. Fire is reviewable at this stage. *See Central Oregon Independent Health Serv. v. OMAP*, 211 Or App 520, 528, 156 P3d 97, *rev den*, 343 Or 159 (2007) ("[A]lthough the denial of a motion for summary judgment generally is not reviewable, in an appeal from a final judgment entered after the granting of summary judgment, the court will review the trial court's denial of a cross-motion for summary judgment." (Citation omitted.)).

[12] This assignment of error, for the reasons addressed with respect to the first and second assignments, is not moot.

recovery that could be covered by the policy[.] * * * An insurer should be able to determine from the face of the complaint whether to accept or reject the tender of the defense of the action.

" 'The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage. * * * Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. * * * Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.'

"*Ledford v. Gutoski*, 319 Or 397, 399-400, 877 P2d 80 (1994) (citations omitted; emphasis in original)."

Furthermore, we have held that "[a]n administrative agency's requirement that a property owner clean up environmental contamination constitutes a 'suit' within the terms of an insurer's duty to defend." *Schnitzer Investment Corp.*, 197 Or App at 155 (citing *St. Paul Fire v. McCormick & Baxter Creosoting*, 126 Or App 689, 700-01, 870 P2d 260, *modified on recons*, 128 Or App 234, 875 P2d 537 (1994), *aff'd in part, rev'd in part on other grounds*, 324 Or 184, 923 P2d 1200 (1996)).

Thus, for purposes of assessing whether the May 1994 letter triggered the duty to defend, we must answer two questions: (1) Did the letter and accompanying documents demonstrate the existence of a "suit" within the meaning of the insurance policies? (2) Did the letter and accompanying documents contain allegations that, without amendment, could impose liability for conduct covered by the policies? With respect to the second issue, any doubt is resolved in favor of the insured. *Schnitzer Investment Corp.*, 197 Or App at 155.

■ To start, we agree with plaintiffs that the DEQ proceedings against Zidell, as described in the May 1994 DEQ letter, constitute a "suit" for purposes of the duty to defend under Beneficial's and U.S. Fire's policies. The May 1994 letter explains that DEQ has completed a "Preliminary Assessment Equivalent" for Zidell and reviewed "various documents covering the past 35 years, including an August

1972 Engineering Report, and a September 1987 federal Preliminary Assessment." The letter indicates that a "Strategy Recommendation" is enclosed and states that "further action is required at [Zidell's site] to address past releases of hazardous substances that may continue to threaten public health or the environment." The letter further provides that representative soil and groundwater samples must be taken to determine the "extent of the residual contamination suspected to be present at the site" and that owners and operators of sites, like Zidell, would be held strictly liable for contamination. Zidell was asked to respond within 30 days of the receipt of the letter as to how it planned to proceed. Under any of the proposed options, the letter explained, "DEQ will either require an agreement to pay its oversight costs as work proceeds, or will track its costs and seek to recover them later from responsible parties." In effect, DEQ told Zidell to investigate and remediate contamination at the site or pay for DEQ to do it—the type of agency ultimatum that we have previously held to constitute a "suit" for purposes of the duty to defend. *Schnitzer Investment Corp.*, 197 Or App at 155; *McCormick & Baxter Creosoting*, 126 Or App at 700-01.

Nonetheless, Beneficial and U.S. Fire contend that our decisions in *Schnitzer Investment Corp.* and *McCormick & Baxter Creosoting* have "no relevance" because this case "involves different facts and policies." Both defendants contend, instead, that their "policy's text and context make clear that 'suit' refers to court actions seeking damages for injury to or destruction of property." (Emphasis by defendants.) We do not see how that is so. Like the policies at issue in *Schnitzer Investment Corp.* and *McCormick & Baxter Creosoting*, the policies here do not define "suit." Nor are we persuaded that any of the other terms of the policies provide sufficiently clear contextual guidance regarding the parties' intended meaning. Accordingly, we see no reason to reach a different interpretation of the term "suit" than we reached in our previous cases.[13]

---

[13] We note that the legislature has codified that same construction of the term. *See* ORS 465.480(2)(b) ("Any action or agreement by the Department of Environmental Quality or the United States Environmental Protection Agency against or with an insured in which the Department of Environmental Quality or the United States Environmental Protection Agency in writing directs, requests or agrees that an insured take action with respect to contamination within the State

██ The remaining question is whether the May 1994 letter and accompanying documents contained allegations that, without amendment, could impose liability for conduct covered by the policies. Beneficial and U.S. Fire argue that their policies covered only third-party property damage to groundwater—not soil. In their view, nothing in the May 1994 letter or accompanying documents indicated the existence of groundwater pollution requiring remediation; rather, the documents were aimed at determining whether remediation was required. Plaintiffs, meanwhile, contend that Beneficial and U.S. Fire read the DEQ letter and documents too narrowly—and inconsistently with the way courts have construed the duty to defend. *See National Union Fire Ins. Co. v. Starplex Corp.*, 220 Or App 560, 583-84, 188 P3d 332 (2008), *rev den*, 345 Or 317 (2009) (*Starplex*) (reasoning that courts "determine whether there is a 'possibility' that the allegations stated in any or all of those complaints is covered under the policy; if a reasonable interpretation of the allegations would bring them within coverage, there is a duty to defend, at least so long as such allegations remain operative" (citing *Paxton-Mitchell Co. v. Royal Indemnity Co.*, 279 Or 607, 611, 569 P2d 581 (1977))).

We agree with plaintiffs. The DEQ letter referenced an attached document entitled "Site Assessment Program—Strategy Recommendation." That document traced Zidell's "long history of waste disposal activities at this site," including spills related to ship dismantling. The facts alleged in the letter and attached document could be read narrowly as Beneficial and U.S. Fire contend—as merely recommending further investigation. But it is reasonable to read them as more than that. In light of the facts in the "Site Assessment Program—Strategy Recommendation," including the long history of Zidell's waste disposal activities and the fact that adjacent property "is known to have soil and groundwater contamination," it is reasonable to read the DEQ letter as requiring further soil and groundwater samples to determine the *extent* of groundwater contamination—that is, not *whether* there is groundwater contamination, but *how much*. That is sufficient to trigger the duty to defend. *Starplex*, 220

of Oregon *is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy.*" (Emphasis added.)).

Or App at 584 ("If any allegation or claim gives rise to coverage, even if other allegations or claims are excluded from coverage, the insurer must defend against all claims asserted.").

For all of those reasons, the trial court erred in ruling in favor of Beneficial and U.S. Fire and against plaintiffs on the parties' cross-motions for partial summary judgment regarding the duty to defend.

### 7. *Proration of defense costs*

Plaintiffs next assign as error the trial court's denial of their motion for partial summary judgment regarding proration of defense costs based on defendants' respective policy limits. Plaintiffs now concede that the ruling denying their motion is not reviewable; for that reason, we do not reach it.

## B. *National Union's cross-assignment of error*

Finally, we turn to defendant National Union's cross-assignment of error. In addition to the motions discussed above, National Union moved for summary judgment on the ground that statutory amendments to the Oregon Environmental Cleanup Assistance Act (OECAA), ORS 465.475 to 465.480, retroactively extinguished plaintiffs' contribution claims. The trial court denied that motion, and National Union now cross-assigns that ruling as error as an alternative basis for upholding the trial court's judgment.[14]

National Union's argument is premised on ORS 465.480(4), a provision of the OECAA that was enacted during the 2003 legislative session—after plaintiffs filed their contribution claims. ORS 465.480(4) provides, in part, that "[a]n insurer that has paid an environmental claim may seek contribution from any other insurer that *is liable or potentially liable*." (Emphasis added.) National Union argues that, as a result of its settlement with Zidell, National Union no longer "is liable or potentially liable" for an environmental claim; hence, plaintiffs cannot seek contribution from National Union under the plain language of the statute. The

---

[14] If correct, the ruling would provide an alternative basis for affirming the judgment as to the other defendants as well, even though they did not join National Union's motion below. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (describing requirements for applying the "right for the wrong reason" principle to affirm the trial court's judgment).

fact that plaintiffs' contribution claims were filed before the effective date of ORS 465.480(4) is of no concern, National Union argues, because the amendments were expressly retroactive, applying to "all claims, whether arising before, on or after the effective date [January 1, 2004]." 2003 Or Laws, ch 799, § 5(1).

Plaintiffs, not surprisingly, read ORS 465.480(4) differently. In their view, the text "is liable or potentially liable" refers to liability *between insurers—i.e.*, contribution liability. And, as discussed above, contribution liability between insurers is not automatically extinguished by way of a settlement between the insured and its insurer. Thus, plaintiffs contend, National Union "is liable or potentially liable" for contribution at this very moment, despite its settlement with Zidell. And in any event, plaintiffs argue, it is unconstitutional to apply a statute retroactively to extinguish their common-law contribution claims.

Our task is to determine the legislature's intent in enacting ORS 465.480(4), which we glean from the text, context, and legislative history of the statute, resorting if necessary to maxims of statutory construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin, as always, with the text of the statute, which provides:

"(4)   An insurer that has paid an environmental claim may seek contribution from any other insurer that is liable or potentially liable. If a court determines that the apportionment of recoverable costs between insurers is appropriate, the court shall allocate the covered damages between the insurers before the court, based on the following factors:

"(a)   The total period of time that each solvent insurer issued a general liability insurance policy to the insured applicable to the environmental claim;

"(b)   The policy limits, including any exclusions to coverage, of each of the general liability insurance policies that provide coverage or payment for the environmental claim for which the insured is liable or potentially liable;

"(c)   The policy that provides the most appropriate type of coverage for the type of environmental claim; and

"(d)   If the insured is an uninsured for any part of the time period included in the environmental claim, the insured shall be considered an insurer for purposes of allocation."

ORS 465.480(4).

As set out above, the parties disagree about the meaning and effect of the first sentence of the statute and, in particular, the phrase "is liable or potentially liable." National Union contends that the "legislature intended ORS 465.480(4) to protect insurers who had settled environmental claims with their insureds, from contribution actions by insurers who refused to settle." That is, National Union argues that the first sentence bars a contribution claim against an insurer who, as a result of settlement, no longer "*is* liable or potentially liable" to its insured. (Emphasis added.) Thus, National Union's cross-assignment of error turns on whether the phrase "is liable or potentially liable" precludes a contribution claim against an insurer who, as a result of a settlement, is no longer liable to its insured for an environmental claim.

Reading the text of ORS 465.480(4) in context, we are not persuaded that the legislature intended the phrase "is liable or potentially liable" to operate as National Union contends. By way of context, Oregon's environmental cleanup statutes set up a scheme of strict liability for owners, operators, and others regarding investigation and cleanup of environmental contamination. *See* ORS 465.255(1) (imposing "strict liab[ility] for those remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release"). At the same time, the statutory scheme is designed to encourage the prompt cleanup of environmental contamination, short of an enforcement action. For example, ORS 465.325 authorizes DEQ to enter into an agreement with "potentially responsible persons" to perform remedial action. The agreement may be entered (in circuit court as a consent judgment) without any admission of liability. ORS 465.325(4)(a) - (c). ORS 465.327 likewise allows DEQ, through a written agreement, to "provide a party with a release from *potential liability* to

the state under ORS 465.255" if certain conditions are met. (Emphasis added.) Thus, the scheme as a whole regulates parties who are liable for environmental contamination as well as those who are only "potentially liable."

The phrase "is liable or potentially liable" is used throughout Oregon's environmental cleanup statutes and, in particular, in three contribution-related statutes: ORS 465.257; ORS 465.325; and ORS 465.480. ORS 465.257(1) provides that "[a]ny person who *is liable or potentially liable* under ORS 465.255 may seek contribution from any other person *who is liable or potentially liable under ORS 465.255.*" (Emphasis added.) ORS 465.325(6)(a) likewise provides that "[a]ny person may seek contribution *from any other person who is liable or potentially liable under ORS 465.255.*"). (Emphasis added.) And ORS 465.480(4) allows an insurer that has paid an environmental claim to "seek contribution from *any other insurer that is liable or potentially liable.*" (Emphasis added.)[15]

One of the best clues as to the legislature's intended meaning of that phrase is that it is used in each instance to describe the universe of persons from whom contribution may be *sought*. That is to be distinguished from describing the persons from whom contribution can be *obtained*. When the legislature addressed the latter issue in the contribution statutes, it did so more explicitly—and more narrowly. Take, for example, ORS 465.257(1). Although the first sentence of that statute allows a plaintiff to "seek" contribution from any other person who "is liable or potentially liable," the second

---

[15] The statutes also use the term to describe an insured's "liability or potential liability" for an environmental claim, *see* ORS 465.480(4)(b) (the court shall consider, in allocating covered damages between the insurers, "[t]he policy limits, including any exclusions to coverage, of *each of the general liability insurance policies that provide coverage or payment for the environmental claim for which the insured is liable or potentially liable*" (emphasis added)). The phrase is used similarly outside of ORS chapter 465. *See* ORS 129.405(1)(g) (trustee shall make "[d]isbursements related to environmental matters, including reclamation, assessing environmental conditions, remedying and removing environmental contamination, monitoring remedial activities and the release of substances, preventing future releases of substances, *collecting amounts from persons liable or potentially liable for the costs of those activities*, penalties imposed under environmental laws or regulations and other payments made to comply with those laws or regulations, statutory or common law claims by third parties and defending claims based on environmental matters" (emphasis added)).

sentence of the statute leaves it to the court to apportion the costs among parties who are ultimately determined to be liable (as opposed to "potentially" liable): "When such a claim for contribution is at trial and the court determines that apportionment of recoverable costs among the *liable* parties is appropriate," the court then determines the share of each party according to various factors, including the "relative culpability or negligence of the *liable* persons." ORS 465.257(1) (emphasis added).

The same is true under ORS 465.325(6)(a). The first sentence of that statute provides, in the context of consent agreements with DEQ, that "[a]ny person may seek contribution from any other person who *is liable or potentially liable* under ORS 465.255." (Emphasis added.) The second sentence, however, provides, "In resolving contribution claims, the court shall allocate remedial action costs among *liable* parties *in accordance with ORS 465.257*"—again leaving it to the court to allocate costs among liable parties. ORS 465.325(6)(a) (emphasis added).

The structure of ORS 465.480(4) parallels that of the other contribution statutes. The first sentence of ORS 465.480(4) provides that a paying insurer may seek contribution from any other insurer that "is liable or potentially liable." The second sentence leaves the merits of the claim to court determination: "If a court determines that the apportionment of recoverable costs between insurers is appropriate, the court shall allocate the covered damages between the insurers before the court, based on [certain enumerated factors]." ORS 465.480(4).

Thus, the context and structure of ORS 465.480(4) undermine National Union's contention that the phrase "is liable or potentially liable" has anything to do with the merits of a contribution claim, let alone bars such a claim in the event of a settlement between the insured and its insurer. Rather, the structure of ORS 465.480(4) suggests that the legislature simply intended to provide that insurers that pay environmental claims can "seek" contribution from other insurers that covered the same risk, whether or not the liability of those other insurers has already been determined (*i.e.*, even if the other insurers are only "potentially liable").

■    Other contextual clues further undermine National Union's suggestion that the "is liable or potentially liable" language in ORS 465.480(4) was intended to address the effect of a settlement on the insurer's exposure to contribution claims. The most significant of those clues, in our view, is the fact that the legislature specifically addressed that very issue—*in a different part of the statute.* *See* Or Laws 2003, ch 799, § 5(4).

ORS 465.480(4), as previously discussed, was enacted as part of the 2003 amendments to the OECAA. The 2003 amendments contained express retroactivity provisions, but those provisions were not codified in the Oregon Revised Statutes. The retroactivity provisions read as follows:

"(1)    Except as provided in subsections (2), (3), and (4) of this section, [the amendments enacting ORS 465.480(3) and (4), among other provisions] * * * appl[y] to all claims, whether arising before, on or after the effective date of this 2003 Act.

"(2)    [The amendments] do not apply to any claim for which a final judgment, after exhaustion of all appeals, was entered before the effective date of this 2003 Act.

"(3)    Nothing in [the amendments] may be construed to require the retrying of any finding of fact made by a jury in a trial of an action based on an environmental claim that was conducted before the effective date of this 2003 Act.

"(4)    *Notwithstanding any other provision of law, an insurer that is a party to an action based on an environmental claim for which a final judgment as to all insurers has not been entered by the trial court on or before the effective date of this 2003 Act and in which a binding settlement has been reached on or before the effective date of this 2003 Act between the insured and at least one insurer that was a party to the action may not seek or obtain contribution from or allocation to:*

"(a)    The insured; or

"(b)    *Any other insurer that prior to the effective date of this 2003 Act reached a binding settlement with the insured as to the environmental claim.*"

Or Laws 2003, ch 799, § 5 (emphasis added).

As the above-emphasized text demonstrates, the 2003 amendments expressly cut off contribution claims against insurers who "reached a binding settlement with the insured as to the environmental claim." The problem for National Union is that section 5(4)(b) only cuts off contribution claims against settling insurers in a narrow window of cases—those in which "a final judgment as to all insurers has not been entered by the trial court on or before the effective date of this 2003 Act." In this case, however, a final judgment *had* been entered before the effective date, making section 5(4)(b) inapplicable.

Section 5(4)(b) of the 2003 amendments is significant for two reasons. First, it demonstrates that the legislature was both aware of the settlement issue and knew how to address it explicitly when that was its desire.[16] Second, section 5(4)(b) would have been meaningless surplusage if the legislature had understood ORS 465.480(4) to operate as National Union contends. *See State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("we assume that the legislature did not intend any portion of its enactments to be meaningless surplusage"); *see also* ORS 174.010. That is because ORS 465.480(4) expressly applied "to all claims, whether arising before, on or after the effective date of this 2003 Act," except where "a final judgment, after exhaustion of all appeals, was entered before the effective date of this 2003 Act." Or Laws 2003, ch 799, § 5(1), (2). If, under ORS 465.480(4), a settlement between an insured and its insurer barred a contribution claim against that insurer in all pending cases, the act would have already accomplished everything that section 5(4)(b) does, thereby

---

[16] A related statute, ORS 465.325(6)(b), likewise deals specifically and expressly with the effect of a settlement by a party that otherwise might be "liable or potentially liable" for purposes of contribution:

"A person who has resolved its liability to the state in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially responsible persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement."

rendering the provision entirely redundant.[17] We assume the legislature would not have drafted the law in that way.[18] *Stamper*, 197 Or App at 418.

Finally, we observe that National Union's construction of the phrase "is liable or potentially liable" is implausible when the phrase is read the same way in other related statutes. *Mid-Century Ins. Co. v. Perkins*, 344 Or 196, 211, 179 P3d 633, *modified on recons*, 345 Or 373, 195 P3d 59 (2008) (where legislature uses the same term in related statutes, the court begins with the assumption that the term has the same meaning in those statutes). National Union contends that, once an insurer has settled its obligation to its insured, the insurer no longer "is liable or potentially liable" within the meaning of ORS 465.480(4). Yet if that same meaning is given to the phrase "is liable or potentially liable" in ORS 465.257, it would gut the statute. ORS 465.257 describes the party *seeking* contribution in terms of "liability or potential liability": "Any person who *is liable or potentially liable* under ORS 465.255 may seek contribution from any other person *who is liable or potentially liable under ORS 465.255.*" (Emphasis added.) As National Union reads the phrase "is liable or potentially liable," a party who has satisfied a judgment against it or already paid the necessary cleanup costs would, at that point, no longer be "liable or potentially liable" within the meaning of ORS 465.257;

---

[17] National Union acknowledges as much in its brief: "No further protections were necessary for settling insurers, beyond the language of the 'is liable or potentially liable' provision."

[18] Indeed, had the legislature intended the "is liable or potentially liable" language to have the effect National Union contends, we would expect some discussion of that issue in the legislative history, particularly in light of section 5(4)(b). The 2003 amendments were extensively debated in House and Senate committees and during floor debates, with full knowledge that the amendments would affect pending cases. *See, e.g.*, Audio Recording, House Committee on Judiciary, Senate Bill 297, July 7, 2003, http://www.leg.state.or.us/listn/archive/archive.2003s/HJUD-200307071241.ram, at 1:12 (discussing pending cases) (accessed Apr 22, 2010). National Union does not direct us to, nor are we aware of, any legislative history that supports the notion that the legislature intended to retroactively extinguish common-law contribution rights when it used the phrase "is liable or potentially liable" in ORS 465.480(4). Indeed, the only mention of anything related to cutting off contribution rights—via settlement with the insured or otherwise—came with respect to the draft amendments that eventually became section 5(4)(b); and even then, there was absolutely no mention of the "is liable or potentially liable" language.

hence, that party would not have any right under the statute to seek contribution. The legislature could not have intended that result. And for that reason, in addition to the others previously discussed, we reject National Union's cross-assignment of error.

## III. CONCLUSION

In sum, the trial court erred in granting summary judgment dismissing plaintiffs' contribution claims. The trial court also erred in ruling in favor of Beneficial and U.S. Fire and against plaintiffs on the parties' cross-motions for partial summary judgment regarding the duty to defend. The court was correct, however, in granting defendants' motion for partial summary judgment regarding plaintiffs' entitlement to attorney fees. Accordingly, we reverse in part and remand for further proceedings.

Reversed in part and remanded.